FILED

April 22 2014

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 13-0050

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 108

STATE OF MONTANA,

       Plaintiff and Appellee,

v.

MICHAEL KENNETH REIM,

       Defendant and Appellant.


APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. DDC 2011-142
Honorable James P. Reynolds, Presiding Judge


COUNSEL OF RECORD:

      For Appellant:

          Wade Zolynski, Chief Appellate Defender, Koan Mercer, Assistant Appellate Defender, Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Tammy A. Hinderman, Assistant Attorney General, Helena, Montana

          Leo J. Gallagher, Lewis and Clark County Attorney, Tara Harris, Deputy County Attorney


Submitted on Briefs:  March 26, 2014
Decided:  April 22, 2014


Filed:

_____
Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1 Michael Kenneth Reim (Reim) appeals from the findings of fact, conclusions of law and verdict of the Montana First Judicial District Court, Lewis and Clark County, finding him guilty of aggravated assault related to injuries incurred by Reim's son, A.R. We affirm.

## ISSUES

¶2 We review the following issues:

*1. Did the District Court err when it concluded Reim had waived his right to a jury trial?*

*2. Should this Court consider whether Reim's absence from the deposition of a State witness violated his right to be present at all critical stages of the proceedings?*

*3. Does the District Court's failure to identify which mental state definition it was applying require reversal of Reim's conviction?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On Sunday, January 30, 2011, Reim had been caring for his five-month old son, A.R., while A.R.'s mother, Rebecca Stringer (Stringer), was at work. Reim and Stringer had a troubled relationship. Reim had been staying in Stringer's garage beginning on or about January 17, 2011, and she had only recently allowed him to move back into the house. When Stringer returned home from her shift that day, she noticed A.R. was lying on the couch, gasping for air. When she picked him up, he began seizing. She became very upset and asked Reim how long A.R. had been acting this way. Reim said he did not know what was wrong with A.R. and that the symptoms had begun about 30 to 45 minutes earlier. Stringer directed Reim to call 911. In the recorded 911 call, Reim described that A.R. was suffering from seizures, difficulty breathing, and unfocused vision.

2

¶4 An ambulance arrived to transport A.R. to the emergency department at St. Peter's Hospital. The emergency department staff did not observe any further seizures. A slight redness in A.R.'s ears was diagnosed as an ear infection. Since Stringer told the doctor that A.R. had had a slight fever during the morning and a bit of a runny nose, the doctor concluded A.R. had suffered a febrile seizure. Febrile seizures are common in young children and result from a rapid change in body temperature. The hospital discharged A.R. into his parents' care with a prescription for Tylenol and the antibiotic Amoxicillin. While at the hospital, Reim told Stringer that he felt responsible for A.R.'s problems because A.R. had been in his care.

¶5 Stringer said that after leaving the hospital that evening, A.R.'s health never seemed right. He appeared lethargic, did not respond normally, ate less than normal and was generally fussy and inattentive. In the middle of the following night, after A.R. had been in Reim's care during the day, Stringer noticed that A.R. was breathing funny and vomiting. She and Reim returned with A.R. to the emergency room for treatment. The staff examined A.R., administered medication for the vomiting, and discharged him into his parents' care for a follow-up examination the next day with Dr. Keefe.

¶6 Dr. Keefe examined A.R. on February 1, 2011. She did not notice any outward signs of trauma. She observed that he still had a mild ear infection that seemed to be improving with treatment. He was fussy, but consolable. She arranged to have A.R. return to the clinic in a few weeks for some routine shots and sent him home to continue the Amoxicillin.

¶7 On the morning of February 2, 2011, while Stringer and her mother, Diana, were caring for A.R., they noticed he was having a seizure and was having difficulty breathing.

3

Stringer called Reim, who had departed with the family's only car to take Diana's partner to a court date, and he drove Stringer and A.R. to the emergency room. At the hospital, A.R. was treated by Dr. Rabold and Dr. Knowles, who called Dr. Keefe to assist. They ordered a number of tests, including central nervous system (brain) imaging that began with a non-contrast CT (computed tomography) scan.

¶8 Dr. Murphy was the radiologist at St. Peter's Hospital. Although she did not testify at trial, various experts reviewed her reports. Her report as to the CT scan diagnosed A.R. as suffering from both chronic and acute subdural hematomas. She cautioned that A.R. could be a victim of child abuse. A subdural hematoma is an accumulation of blood caused by bleeding between the hard, outermost layer of the brain known as the dura and the next layer, a delicate, thinner inner membrane known as the arachnoid. Dr. Murphy recommended that A.R. needed more definitive testing by way of a MRI (magnetic resonance imaging) scan and a MRI scan with a contrasting agent in the blood. Those scans were performed.

¶9 Dr. Murphy interpreted the MRI scans in the presence of Dr. Keefe. Dr. Keefe testified that Dr. Murphy expressed uncertainty as to whether the bleeding was caused by a dural venous sinus thrombosis or non-accidental trauma. Dr. Murphy's report on reviewing the MRIs, however, expresses the opinion that the bleeding was caused by a dural venous sinus thrombosis. A dural venous sinus thrombosis is a rare form of stroke in a child that results from thrombosis (a blood clot) in one or more of the dural venous sinuses that drain blood from the brain. Doctors refer to this type of thrombosis as a cerebral venous thrombosis or CVT.

¶10   Because Dr. Keefe recognized the bleeding in A.R.'s brain as a potentially lethal condition, she arranged to send A.R. to the only pediatric intensive care unit (PICU) in Montana, at St. Vincent's Hospital in Billings.  Dr. Keefe also recognized that the condition could be the result of child abuse and reported her suspicions to the Child Abuse Hotline maintained by the Montana Department of Public Health and Human Services (DPHHS), as she understood she was obligated to do by Montana law.  As a result, child protection specialist (CPS) Brittany Divine traveled to St. Peters Hospital to begin an investigation. Detective Cory Olson also heard of the hospitalization and traveled to the hospital, where he spoke to Dr. Rabold, CPS Divine, Reim and Stringer.

¶11   Upon arrival at St. Vincent's Hospital, A.R. presented a "triad" of symptoms: Chronic subdural hematomas (old bleeding in the brain), acute subdural hematomas (new bleeding in the brain), and asymmetric retinal hemorrhages (bleeding in the eyes).

¶12   At St. Vincent's, A.R. was treated by Dr. Bakdash, a pediatric neurologist-epileptologist, Dr. Stears, a diagnostic neuroradiologist, Dr. Weaver, a pediatric ophthalmologist, and PICU intensivists Dr. King and Dr. Kesavulu.  After reviewing the imaging done at St. Peters, Dr. Stears saw no evidence of dural venous sinus thrombosis.  In Dr. Stears's view, A.R. suffered from chronic bifrontal subdural hematomas and acute hematomas.  A.R. also underwent additional tests at St. Vincent's, including a MRV[1] (magnetic resonance venogram) and another MRI.  The MRI revealed two contusions on the

---

[1] The MRI sequences use magnetism to evaluate brain tissue.  By modifying those different sequences, doctors can accentuate or de-accentuate different types of brain tissue. The MRV is specifically designed to measure velocity within the draining venous structures of the brain.  It is the "gold standard" for evaluation of venous sinus thrombosis.

5

back of A.R.'s brain and two separate blood collections in the front of his skull. The tests, in Dr. Stears's opinion, did not disclose evidence of thrombosis, but rather, indicated persistent bilateral subdural hematomas in a pattern that he considered highly suggestive of non-accidental trauma. Dr. Stears indicated that the older hematomas were likely at least a month old, and that the more recent hematomas were likely a few days old. He testified that CVT in children is rare. Dr. Stears, who has extensive experience interpreting diagnostic imaging related to adult stroke victims, was convinced A.R.'s injuries were not attributable to a CVT.

¶13     Dr. Weaver examined A.R. on February 4, 2011, and mapped the retinal hemorrhages he observed in A.R.'s eyes. The retinal hemorrhage in A.R.'s left eye was one Dr. Weaver characterized as "severe," with potential to cause blindness if left untreated. A.R. required surgery in Salt Lake City to treat this condition. The retinal hemorrhage in the right eye resolved itself with time. Although A.R.'s vision is improving, he has developed crossed eyes and will likely require surgery to correct this problem. In Dr. Weaver's view, A.R.'s hemorrhages were the result of non-accidental trauma. Most of the injuries like A.R.'s that Dr. Weaver had seen were attributable to child abuse.

¶14     Dr. Bakdash and the other members of A.R.'s medical team determined that A.R. was a victim of child abuse. To be certain about his opinion, Dr. Bakdash reviewed not only A.R.'s medical records, but the opinion written by Reim's expert, Dr. Laposata, as well as all of the medical literature he could find on the subject, including a 2012 textbook he described as the "bible" of pediatric neurology. Dr. Bakdash could not find a single case that involved the triad of injuries A.R. suffered that was accidentally caused. Although any of the injuries alone could have been caused by child abuse, the presence of the triad convinced Dr. Bakdash that A.R. was a victim of abuse.

¶15     The doctors ordered blood tests and, on June 18, 2012, the parties received some of the results of a blood test conducted on A.R. The results showed A.R. had an immeasurably low protein S level. Protein S is an anticoagulant. A child with a protein S deficiency is more susceptible to blood clots throughout the body and brain. In A.R.'s case, both parts of the protein S gene are abnormal. Three days later, the parties received the remaining blood test results. Those tests revealed that A.R. suffers from an additional blood clotting abnormality relating to both parts of factor V Leiden. Factor V Leiden is a specific gene mutation that results in an increased tendency to form blood clots.

¶16     Defense expert Dr. Laposata testified at trial that the results of A.R.'s blood test made him the most pro-thrombotic person Dr. Laposata has ever seen. Due to these genetic factors, it was Dr. Laposata's opinion that even minor risks—for example, an ear infection— could trigger thrombosis in A.R. Further, Dr. Laposata explained that a clotting disorder and resulting thrombosis could cause a vein to rupture and develop into a subdural hematoma. Subdural hematomas, in turn, he testified, were associated with retinal hemorrhages.

7

Vomiting, coughing and other symptoms could also cause retinal hemorrhages. Trauma, he testified, could also cause subdural hematomas, CVT, or retinal hemorrhages. Dr. Laposata's ultimate opinion was that "to say that the only explanation for these findings is child abuse and that the child was hit or struck is highly unlikely" because he could "put together all of the observed findings with objective data."

¶17 When A.R. arrived at St. Vincent's, Dr. Bakdash obtained a history from Stringer. At that time, the hospital staff had identified child abuse as a possible cause of A.R.'s injuries, but Stringer did not exhibit any knowledge about how A.R. was hurt. She did mention some history of domestic turmoil between herself and Reim. While A.R. was at St. Vincent's, Stringer and Reim stayed in a Ronald McDonald room near the PICU. Reim left after the two argued sometime around February 5, 2011. Stringer testified this occurred because she learned A.R.'s doctors believed he was a victim of child abuse. She said Reim was not behaving normally towards her; that he was trying to "suck up" to her, and even proposed marriage to her, rather than treating her coldly, as he usually did. She asked him whether he had hurt A.R. Reim responded that he did not hurt A.R., or that if he had hurt A.R., he had not meant to. In a later, February 22, 2011, interview with Detective Olson, Reim admitted that he might have hurt A.R. when he became frustrated because A.R. was fussy and could not be calmed down. Reim described dropping A.R. on the couch in frustration, eliciting an audible gasp or moan from the child. He also described a separate incident when he laid A.R. on the couch in such a way that A.R.'s head struck the arm of the couch loud enough to hear a sound. He said that after both of those incidents A.R. appeared normal. Reim's

8

descriptions of events to Detective Olson varied somewhat over the course of two interviews with the detective.

¶18  Prior to the incidents and A.R.'s diagnosis, A.R. had some significant medical history. He was born five to six weeks premature. Stringer had a difficult labor. She suffered from chorioamnionitis (infection of the placenta) during A.R.'s gestation and birth. When he was born, A.R. was diagnosed with respiratory distress syndrome, was jaundiced, was on antibiotics for five days, and was on supplemental oxygen for seven days. He also had a slightly high bilirubin count. On November 10, 2010, when A.R. was about two months old, Stringer called an ambulance to take A.R. to the hospital's emergency room because he appeared "dusky" and had a breathing event lasting about five to ten seconds, while at home. She saw another event at the hospital, but the emergency room staff did not observe the event. Lab work at the hospital revealed A.R. had a high glucose level and he was admitted to the hospital overnight for observation. When Dr. Keefe examined A.R. the next morning, his glucose had returned to normal and he seemed healthy, so she discharged him. The high glucose level indicated to Dr. Keefe that A.R. could have been diabetic, although that seemed unlikely to her because he lacked other symptoms. The high glucose also could, in her view, have been a response to a traumatic event, such as a seizure or some other event that temporarily interrupted A.R.'s breathing. Dr. Keefe's discharge notes also indicated that A.R.'s glucose level could have been caused by choking.

¶19  At trial, Dr. Guggenheim, a pediatric neurologist, testified that in her clinical experience treating epilepsy, the most common cause of elevated glucose in infants is seizure. Infant seizures are often brief and can occur with little to no outward appearances.

9

Even trained professionals can fail to identify such seizures. Dr. Guggenheim based her opinion on the symptoms Stringer described and on her independent analysis of the data charting A.R.'s head size following his birth. A.R.'s growth had been charted on a chart that did not take into account the fact he was born prematurely. With adjustment for A.R.'s gestational age, his head circumference grew disproportionately to the rest of his general physical development between shortly after his birth and October 25, 2010. In Dr. Guggenheim's view, this could have been caused by prior bleeding in A.R.'s brain and consequent swelling, resulting in this abnormal growth. Dr. Guggenheim believed A.R. likely suffered from a chronic neurologic abnormality of the brain since birth.

¶20 On May 26, 2011, Reim was charged by amended information with felony aggravated assault related to A.R.'s injuries. An omnibus hearing occurred and a memorandum documenting the results of that hearing was filed on February 23, 2012. The memorandum provided that the State waived its right to a jury trial. The box on the item "[t]he Defendant waives the Defendant's right to a jury trial and stipulates to the trial taking place without a jury" is checked "no." Below that item, the memorandum provided that the expected length of the trial was five days and the jury would consist of twelve jurors. It also provided that trial was set for June 19, 2012, and that a jury would be drawn on June 4, 2012. The separate signature line providing that the defendant waived his right to a jury trial was unsigned.

¶21 On May 15, 2012, Reim, through his attorney, filed a "motion to vacate jury trial and set for judge trial." The District Court granted that motion on May 16, 2012, vacating the scheduled jury trial and setting the matter for a bench trial.

¶22 On May 16, 2012, the State filed a motion for an Order directing deposition to preserve Dr. Bakdash's testimony for use at trial, because Dr. Bakdash was planning to move out of state before the trial date. The District Court granted that motion the following day, in an Order that specifically authorized the State to give notice to the defendant as to the time and place for taking the deposition. The State served notice of the time, date and location of the deposition on the defendant and his attorney on May 18, 2012. The notice specifically invited the defendant and his attorney to attend and examine the deponent. Reim's attorney attended the deposition; Reim did not.

¶23 A bench trial was held on June 19-22, 2012. At the outset of the trial, the judge stated that he had "on the record" a waiver signed by Reim of his right to a jury trial. Therefore, he stated, the proceeding was a bench trial. Also at the outset, the State announced its intention to present Dr. Bakdash's videotaped deposition along with a deposition transcript. Neither Reim nor his counsel objected during the discussion of these matters.

¶24 During the trial a number of different medical experts testified about A.R.'s injuries. Stringer testified about the events that transpired and about her relationship with Reim. Detective Olson testified about his interviews with Reim; and parts of Olson's two videotaped interviews with Reim were played at trial. Reim was present, but did not testify.

¶25 On August 21, 2012, the judge issued a verdict supported by extensive findings of fact and conclusions of law. In his findings and conclusions, the judge found that A.R.'s injuries were the result of non-accidental trauma; that the injuries were inflicted the weekend before Wednesday, February 2, 2011, while A.R. was in Reim's care; that Reim caused the injuries; and that Reim acted purposely and knowingly when causing the injuries. The judge noted,

11

specifically, that Reim had admitted to being frustrated with A.R., that Reim had failed to respond to A.R.'s initial breathing event for a significant period of time, and that A.R. had not had another "thrombotic event" since being removed from Reim's care. Based on these findings and conclusions, the judge concluded, beyond a reasonable doubt, that Reim was guilty of aggravated assault. Following a sentencing hearing, the judge sentenced Reim to the Montana Department of Corrections for ten years with five suspended. Reim appeals.

**STANDARDS OF REVIEW**

¶26    This Court's review of preserved constitutional errors is plenary. *State v. Stock*, 2011 MT 131, ¶ 16, 361 Mont. 1, 256 P.3d 899. When reviewing judge-made findings of fact on the substantive elements of a criminal offense, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Bower*, 254 Mont. 1, 7, 833 P.2d 1106, 1110 (1992). This Court will affirm a district court's decision when it reaches the right result, even though the court's reasoning is not entirely correct. *State v. Shepard*, 2010 MT 20, ¶ 9, 355 Mont. 114, 225 P.3d 1217.

¶27    *1. Did the District Court err when it concluded Reim had waived his right to a jury trial?*

¶28    Generally, we will not address issues raised for the first time on appeal.  *State v. Taylor*, 2010 MT 94, ¶ 12, 356 Mont. 167, 231 P.3d 79.  Failure to make a timely objection constitutes a waiver of the objection for purposes of appeal.  Section 46-20-104(2), MCA.  We will not put a district court in error for an action in which the appealing party acquiesced or actively participated.  *State v. Daniels*, 2011 MT 278, ¶ 36, 362 Mont. 426, 265 P.3d 623.

¶29    At our discretion, we may review unpreserved claims alleging violation of fundamental constitutional rights, under the common law plain error doctrine.  *Taylor*, ¶ 12.  We invoke the plain error doctrine sparingly, on a case-by-case basis.  *Daniels*, ¶ 32.  We will exercise plain error review only when the appellant convinces us that failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process.  *Daniels*, ¶ 32; *see Taylor*, ¶ 12.

¶30    The right to a trial by jury is fundamental, personal to the defendant, and is guaranteed by both the Montana and Federal Constitutions.  Mont. Const. art. II, §§ 24, 26; U.S. Const. art. III, § 2; U.S. Const. amend. VI; *State v. Dahlin*, 1998 MT 113, ¶ 15, 289 Mont. 182, 961 P.2d 1247.  Waiver of the right to a jury trial can only occur upon written consent of the parties, filed with the district court.  Section 46-16-110(3), MCA; *see Dahlin*, ¶¶ 19-23.  In *Dahlin*, this Court exercised plain error review to reach the defendant's contention that he had not waived his right to a jury trial, concluding that failure to review that claim would leave unsettled a question as to the fundamental fairness of the trial.  *Dahlin*, ¶ 15.  We

conclude the same result is required here; and exercise plain error review to address Reim's claim that the District Court improperly concluded he had waived his right to a jury trial.

¶31    A criminal defendant must consent to waiving constitutionally-guaranteed fundamental rights and there is a reasonable presumption against such a waiver. *See State ex rel. Long v. Justice Court*, 2007 MT 3, ¶ 15, 335 Mont. 219, 156 P.3d 5 ("None of [the rights guaranteed a criminal defendant in Mont. Const. art. II, § 24] can be taken from a defendant without his or her consent[.]"); *State v. Walker*, 2008 MT 244, ¶ 18, 344 Mont. 477, 188 P.3d 1069 ("[C]ourts indulge in every reasonable presumption against waiver of fundamental constitutional rights and will not indulge in any presumption of waiver."). Thus, as we explained in *Walker,* for a waiver to be effective, a defendant must waive a known right knowingly, intelligently and voluntarily. *Walker*, ¶ 18. In Montana, as we clarified in our decision in *Dahlin*, § 46-16-110(3), MCA, sets forth the process by which a defendant may waive his or her right to trial by jury. *See Dahlin*, ¶¶ 19-23.

¶32    In *Dahlin*, we held that both parties must consent in writing in order to waive the fundamental right to a jury trial. *Dahlin*, ¶ 23. There, the defendant's attorney orally waived his client's right to a jury trial in open court, in the defendant's presence. *Dahlin*, ¶ 5. The only reference to the defendant's waiver of his right to a jury trial was the court's minute entry documenting the attorney's statement. *Dahlin*, ¶ 20. We determined that "this minute entry, or an oral representation by Dahlin's attorney, is not sufficient under § 46-16-110(3), MCA, for Dahlin to have waived his right to a jury trial." *Dahlin*, ¶ 20. Pursuant to the requirements set forth by the legislature in § 46-16-110(3), MCA, we reasoned, a criminal defendant's waiver of his right to a jury trial must be in writing, with the consent of both

14

parties, and filed with the district court. *Dahlin*, ¶¶ 22-23. We expressly overruled the test we had set forth in *State v. McCartney*, 179 Mont. 49, 56, 585 P.2d 1321, 1325 (1978), under which we would examine the totality of the circumstances to determine whether a defendant's waiver was intelligent and voluntary. *Dahlin*, ¶ 23.

¶33 On appeal, Reim relies on a rigid reading of *Dahlin* to argue that, because he never personally signed a written waiver of his right to a jury trial, his conviction must be reversed. But this case is different from *Dahlin*, where the record was silent as to Dahlin's waiver of his right to a jury trial. More than an oral statement by an attorney, documented in court minutes confirms that Reim waived his right to a jury trial. Here, the Omnibus Hearing Memorandum shows that the State waived its right to a jury trial. Reim did *not* originally waive his right to a jury trial. In fact, the Omnibus Hearing Memorandum specifies the number of jurors and sets a date for the jury trial. The signature line providing that Reim waives his right to a jury trial is unsigned. Yet, approximately three weeks after the omnibus hearing, Reim's counsel filed a motion with the court to vacate the jury trial and set the matter for a bench trial. That motion was signed by the attorney and filed with the court. On the day trial began, when the judge stated in Reim's presence that Reim had waived his right to a jury trial, neither Reim nor his attorney objected.

¶34 We conclude that Reim's attorney's motion, along with Reim's acquiescence to the judge's statement at trial, provides a sufficient foundation to support our determination that Reim made an intelligent and voluntary jury trial waiver. Although a signed statement by Reim providing he waived his right to a jury trial would have been preferable, the motion, signed by Reim's attorney, satisfies the statutory requirement for written consent. Reim,

15

through his silence at trial, actively participated in the alleged error he now contests. There has been a written waiver of the right to a jury trial by both parties, ratified by the defendant through his failure to object and his acquiescence to the trial being conducted, from beginning to end, by the judge. We will not put the District Court in error under these circumstances.

¶35　*2. Should this Court consider whether Reim's absence from the deposition of a State witness violated his right to be present at all critical stages of the proceedings?*

¶36　A criminal defendant has a fundamental right under both the United States Constitution and the Montana Constitution to be present at all critical stages of the trial. *State v. Matt*, 2008 MT 444, ¶¶ 16-17, 347 Mont. 530, 100 P.3d 244, *overruled on other grounds*, *State v. Charlie*, 2010 MT 195, ¶ 45, 357 Mont. 355, 239 P.3d 934. The right to be present attaches whenever the defendant's presence "has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Charlie*, ¶ 40 (citing *Matt*, ¶ 16). The right to physical presence allows a criminal defendant to participate in the preservation of his or her rights and safeguards the public's interest in a fair and orderly judicial system. *See Matt*, ¶ 16. In *Matt*, we employed a three-step analysis to review Matt's alleged violation of his right to be present: First, we considered whether the alleged violation occurred at a "critical stage" of the proceedings; second, we addressed whether the defendant had validly waived the right to be present; and third, we analyzed whether any violation of the defendant's right to be present was harmless error. *Matt*, ¶ 18; *State v. Wilson*, 2013 MT 70, ¶ 12, 369 Mont. 282, 297 P.3d 1208.

16

¶37 Reim argues that his right to be present at critical stages of the proceedings was violated when Dr. Bakdash was deposed in his absence. The State argues that Reim never raised this argument below and, thus, that it was not properly preserved for this Court's review. The State also points out that Reim does not argue that this issue is appropriate for plain error review. Instead, Reim cites *State v. Bird*, 2002 MT 2, 308 Mont. 75, 43 P.3d 266, *State v. Kennedy*, 2004 MT 53, 320 Mont. 161, 85 P.3d 1279, and *Wilson*, to support his view that no objection at trial is necessary to preserve for appellate review a claimed right of presence violation. Reim further contends that, even if it were necessary for him to specifically request plain error review, he has effectively done so by relying upon this Court's handling of the right of presence claims in *Bird*, *Kennedy*, and *Wilson*. Reim is correct that we examined right to be present claims in these cases despite the defendant's failure to raise the issue first in the trial court; however, Reim misreads the cases as standing for a rule that defendants need not preserve such claims for appellate review.

¶38 The general rule is that an objection concerning constitutional matters must be raised before the trial court, and if the objection is not made, it will not be reviewed on appeal. *State v. LaDue*, 2001 MT 47, ¶¶ 28, 30, 304 Mont. 288, 20 P.3d 775 (refusing to review LaDue's constitutional claim because he had not raised the issue at trial); §§ 46-20-104(2), -701(2), MCA. This Court's common law power of plain error review is an exception to that rule. *See State v. Norman*, 2010 MT 253, ¶ 17, 358 Mont. 252, 244 P.3d 737. In order to obtain review under the plain error doctrine, the defendant must (1) show that the claimed error implicates a fundamental right and (2) firmly convince this Court that failure to review the error would result in a manifest miscarriage of justice, leave unsettled the question of the

17

fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process. *Norman*, ¶ 17.

¶39 Reim is correct that we have exercised something akin to plain error review of unpreserved right to presence violations. In *State v. Tapson*, 2001 MT 292, ¶¶ 23-24, 307 Mont. 428, 41 P.3d 305, we decided to review Tapson's unpreserved right to presence claim despite the State's argument that Tapson had waived the right. Four weeks after *Tapson*, in *Bird*, we again rejected an argument that a defendant had forfeited the right to argue his right to presence had been violated where he failed to raise that claim in the court below. *Bird*, ¶¶ 37-38. In *Kennedy* we rejected the same argument. *Kennedy*, ¶¶ 28-30. In *Wilson*, we did not consider whether Wilson had properly preserved his right to presence claim for appeal.

¶40 In light of the parties' arguments in the present case, we deem it necessary to clarify the procedural requirement of preserving right of presence claims for appellate review. Our decisions to reach the merits of the defendants' claims in *Tapson*, *Bird*, *Kennedy*, and *Wilson* should not be understood as excepting all right of presence claims from the general rule that a constitutional violation must be first presented to the trial court. We hold that, in the absence of a timely objection in the trial court, the defendant must obtain review of a right of presence claim under one of the established methods, such as plain error review or an ineffective assistance of counsel claim. In the present case, as noted, Reim has suggested that his claim may be reviewed under the plain error doctrine.

¶41 Reim has not persuaded us that plain error review is merited, here. The record reflects that the State properly served notice of the deposition on Reim's attorney, inviting Reim and

18

his attorney to be present for the deposition (as was Reim's prerogative, *see* § 46-15-202(5), MCA). Reim's attorney accepted the invitation and cross-examined Dr. Bakdash at the deposition. The deposition was video-recorded and the recording was played at the bench trial, at which Reim was present. When the recording was played, Reim asserted no objection to Dr. Bakdash's statements or to the fact that he had not been personally present at the deposition. Reim has not explained how he could have meaningfully contributed to his counsel's cross-examination of Dr. Bakdash at the deposition. Reim points out that, in the analysis of a right of presence violation, the burden is on the State "to demonstrate that there is no reasonable possibility that the violation prejudiced the defendant[.]" *Charlie*, ¶ 45. However, in an analysis of the threshold question of whether this Court should exercise plain error review of a right of presence claim, the burden is on the defendant to firmly convince this Court that such review is warranted. *Norman*, ¶ 17. Reim has not met this burden. We therefore decline to address his claim any further.

¶42    *3. Does the District Court's failure to identify which mental state definition it was applying require reversal of Reim's conviction?*

¶43    Finally, Reim argues that the District Court must have applied the conduct-based definitions of purposely or knowingly when it found Reim guilty of aggravated assault; and that this error requires that we reverse Reim's conviction. The State argues that Reim's conviction must stand because a reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See State v. Meckler*, 2008 MT 277, ¶ 9, 345 Mont. 302, 190 P.3d 1104. The State further argues that, in any case, if the court's order incorporated the wrong definitions of purposely or knowingly, the error was harmless.

19

¶44 Section 45-5-202, MCA, provides that a person commits aggravated assault if "the person purposely or knowingly causes serious bodily injury to another[.]" "[A] person acts purposely with respect to a result or to conduct described by a statute defining an offense if it is the person's conscious object to engage in that conduct or to cause that result." Section 45-2-101(65), MCA.

> [A] person acts knowingly with respect to conduct or to a circumstance . . . when the person is aware of the person's own conduct or that the circumstance exists. A person acts knowingly with respect to the result of conduct . . . when the person is aware that it is highly probable that the result will be caused by the person's conduct.

Section 45-2-101(35), MCA. "The existence of a mental state may be inferred from the acts of the accused and the facts and circumstances connected with the offense." Section 45-2-103(3), MCA. In addition:

> If purposely or knowingly causing a result is an element of an offense and the result is not within the contemplation or purpose of the offender, either element can nevertheless be established if: . . . (b) the result involves the same kind of harm or injury as contemplated but the precise harm or injury was different or occurred in a different way, unless the actual result is too remote or accidental to have a bearing on the offender's liability or on the gravity of the offense.

Section 45-2-201(2)(b), MCA.

¶45 The District Court's findings of fact and conclusions of law addressed the mental state with which Reim acted. The District Court found beyond a reasonable doubt "that Reim acted purposely or knowingly when causing the injuries to [A.R.]." In another finding, the District Court also took special note of the facts and circumstances connected to the offense:

> Reim was the sole caretaker of [A.R.] during these times. In lying [A.R.] on the couch, Reim struck [A.R.]'s head against the arm of the couch loud enough to hear a sound, and that Reim placed [A.R.] so forcefully on the

20

couch that [A.R.] gasped for breath and moaned. The Court is also mindful of Reim's self-admitted frustration with [A.R.] during these events. The Court considers Reim's lack of response to [A.R.]'s unusual breathing when Stringer returned home on Sunday significant, when he reported that [A.R.] had been demonstrating this behavior for a period of [30 to 45] minutes. Finally, the Court considers the fact that [A.R.] has not had another thrombotic event since February 2011 and his removal from Reim's care.

The District Court recognized the role A.R.'s clotting disorder might have played in his injuries, but reasoned:

The Court does not, however, understand how this proclivity alone, or the seizure in November, or [A.R.]'s ear infection, can account for the severe retinal hemorrhaging in [A.R.]'s eyes. No doctor convincingly testified contrary to Dr. Weaver's expert opinion that such hemorrhaging was due to some form of traumatic event.

In its legal conclusions, the District Court stated: "During January 29, 2011, and up to February 2, 2011, Reim committed the offense of aggravated assault . . . beyond a reasonable doubt by purposely or knowingly causing serious bodily injury to [A.R.]." Beyond these statements, however, the District Court did not identify which definitions of purposely and knowingly it was applying.

¶46 We conclude that the District Court did not commit reversible error in rendering its verdict that Reim was guilty of aggravated assault. The weight of the evidence and the credibility of the witnesses are exclusively within the province of the trier of fact; when the evidence conflicts, the trier of fact determines which shall prevail. *Bower*, 254 Mont. at 8, 833 P.2d at 1111. It was reasonable for the court to infer from the evidence and testimony presented that Reim acted purposely and knowingly with respect to the result of serious bodily injury. Even if Reim did not intend specifically to inflict subdural hematomas and retinal hemorrhages on A.R., setting a five-month old infant on the couch, in anger, hard

enough that he gasped for air, evidences an intent to cause some injury. Similarly, moving the infant so that he struck his head on the arm of the couch also shows intent to cause some harm. Reim cannot escape liability simply because the harm that occurred was different or occurred in a different way than the injury he anticipated. Nor was the possibility that Reim's forceful handling of a small baby could cause such harm too remote to have bearing on Reim's liability. We also note that evidence existed from which the District Court could have inferred that Reim's conduct towards A.R. was more violent than Reim admitted, including circumstantial evidence of the extent of A.R.'s injuries and the testimony of the doctors who treated A.R. The District Court could reasonably have concluded that Reim had minimized his report of his conduct in an attempt to avoid prison. A reasonable trier of fact, on this record, could have found the State proved the elements of aggravated assault beyond a reasonable doubt.

¶47 Because we conclude that the District Court committed no error, we will not engage in harmless error analysis.

**CONCLUSION**

¶48 Affirmed.

/S/ MICHAEL E WHEAT

We Concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ JIM RICE