FILED

07/06/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0267

DA 19-0267

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 163

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

WALLIS SINZ,

      Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDC 2017-305
Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      William Boggs, Attorney at Law, Missoula, Montana

      For Appellee:

      Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

      Leo J. Gallagher, Lewis and Clark County Attorney, Melissa Broch, Deputy
County Attorney, Helena, Montana

Submitted on Briefs:  January 20, 2021

Decided:  July 6, 2021

Filed:

_____
               Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1     Defendant Wallis Sinz appeals from the March 21, 2019 Judgment and Commitment of the First Judicial District Court, Lewis and Clark County, following his felony convictions of Sexual Intercourse Without Consent and Sexual Assault, in violation of §§ 45-5-503 and -502, MCA.  We address the following issues on appeal:

> *Issue One: Whether Sinz received ineffective assistance of counsel.*
>
> *Issue Two: Whether this Court should exercise plain error review regarding Sinz's claims about expert testimony undermining his presumption of innocence.*
>
> *Issue Three: Whether the District Court erred by answering a jury question during deliberation without consulting the parties.*

¶2     We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     On August 7, 2017, the State charged Sinz with three counts of sexual intercourse without consent and two counts of sexual assault based on allegations that he had sexually abused his eight-year-old twin nieces, K.B. and D.B., on multiple occasions between January and July 2017.  Sinz was convicted following a jury trial on October 22-24, 2018.

¶4     During voir dire, which was conducted both in open court and privately in chambers, sixteen jurors were excused for cause because they expressed their inability to be impartial due to professional, personal, or family experience with sexual abuse cases.  One juror, D.C., disclosed in chambers that a similar crime had occurred in his family, but he assured the court that he could remain impartial:

> Court: What did you feel you needed to tell us about?

2

D.C.: More of a full disclosure. My brother-in-law -- actually my ex-brother-in-law is in prison for a very similar crime to my niece, who I believe was eight years old at the time. There was plenty of years that had passed before she accused him, and she did it because of her little sister. It's hard to say what it will be like during trial, but right now I don't think it will be an issue but –

Court: Okay.

D.C.: Just full disclosure.

Court: All right. [Prosecutor], do you want to ask any questions?

Prosecutor: I don't, Judge. Just could you set it aside if the Judge were to instruct you that -- set that aside and decide the case on the basis of the facts you heard in court this week? Could you do that?

D.C.: That's what I'm saying. The answer to that now is yes. It's a different situation going through trial and whatnot, so –

Court: But you –

D.C.: As of right now, yes.

Court: You felt you needed to disclose this to us so we're aware?

D.C.: Yes.

Court: Thank you, [D.C.]. We'll see you after lunch.

¶5 Later, during defense counsel's voir dire, D.C. spoke about his prior service as a juror at a DUI trial, describing the experience as "confusing." When defense counsel asked why it was confusing, D.C. explained that there were different statements and perceptions from the two sides, but "there was a lot of video evidence that ultimately helped" the jury reach a guilty verdict in that case. Defense counsel neither sought to remove D.C. for cause nor exercised a peremptory challenge. The jury selected D.C. to serve as jury foreman.

3

¶6     K.B. and D.B. testified at trial.  D.B. testified that on more than one occasion, Sinz rubbed her "privates" and "front end" with his hands underneath her clothing while she sat on his lap.  D.B. testified that sometimes it felt good when Sinz rubbed her privates but said it hurt when he "reached down too far."  D.B. also described and drew a picture of an instance in the bathroom when Sinz "kissed" and "licked" her privates.  Sinz told D.B. not to tell anyone about the events, and D.B. explained she thought she would get in trouble "[f]or telling what Uncle did."  D.B. eventually disclosed the abuse to her parents, who contacted the police.

¶7     K.B. testified that Sinz rubbed her "vagina" on more than one occasion.  K.B. testified that sometimes it felt good, but other times it did not because his fingernails were sharp.  K.B. also testified that, on one occasion during a camping trip, Sinz touched her vagina with "his vagina," which K.B. described as being "between his legs" in the front of his body.  As with D.B., Sinz told K.B. not to tell anyone about their experience, and K.B. believed her parents would be mad at her and not let her see her uncle again.

¶8     Dr. Erin Keefe performed sexual assault examinations of K.B. and D.B. in July 2017.  At trial, Dr. Keefe explained that for the girls to have felt either pleasure or pain when their genitalia were touched, the vulva had to be penetrated.

¶9     The District Court also heard testimony from Dr. Wendy Dutton, an expert witness with experience and education in the field of child sexual abuse.  Testifying as a blind witness with no knowledge of facts related to the case, Dr. Dutton provided general information about issues concerning children's sexual abuse disclosures.  Throughout her

testimony, Dr. Dutton emphasized that she was not offering any comment on the credibility of D.B. or K.B. Sinz did not object to Dr. Dutton's testimony at trial.

¶10 Dr. Dutton testified that children are less likely to be abused by a stranger, and it is "more frequent" that children are abused by someone they know through a process of victimization. Dr. Dutton testified that children often delay disclosing incidents of sexual abuse, but whether a disclosure is delayed or immediate generally has no correlation to whether the allegation is true or false. When asked to explain what she meant by "false allegations of sexual abuse," Dr. Dutton explained that false allegations generally, but not exclusively, occur in two types of scenarios. The "more common" false allegation is an erroneous report where, upon investigation, there is a normal and innocuous explanation for the child's statements (e.g., touching during bath time). The other is a "malicious false report, which tends to be more rare." This type of report is usually connected to an ulterior motive or attempt to secure secondary gain. Dr. Dutton explained that when incidents of false malicious reports occur:

> [T]hey tend to occur most commonly, but not exclusively, in two situations. The first is generally involving young children whose parents are involved in a high conflict divorce or custody dispute. . . . The [second situation is] typically the teenage girls. And usually the goal or ulterior motive is trying to cover up the fact that they are having consensual sex with somebody.

¶11 When asked during cross-examination if she was there to comment on the credibility of K.B. and D.B. or offer an opinion about whether the allegations in the present case were true, Dr. Dutton responded that she was not and "it wouldn't be appropriate." When explaining how information about child sex abuse victims is gathered, Dr. Dutton clarified that the factors a researcher may look for in a child's statement is "different from what a

5

jury does when the jury listens to all the witnesses and then makes an assessment of credibility."

¶12 During closing argument, when referring to Dr. Dutton's testimony, the prosecutor stated that "Dr. Dutton wasn't here to comment on the girls' credibility, but what she told you is that incidents of malicious false allegations of child sex abuse are very rare. And I would submit to you this is not one of those cases."

¶13 Following closing arguments and jury instructions, the jury retired to deliberate. After deliberating for two hours, the jury submitted a written inquiry to the court. The court convened the parties, and the jury's inquiry was read aloud. Following discussion with the parties, the court wrote back to the jury, "I cannot answer your questions. You must review the evidence and the instructions." There followed some discussion about whether the parties needed to be convened if another jury question was submitted, and the court stated it would "probably" call them in to consult.

¶14 A few hours later, the jury submitted a second written question to the court: "What happens if we cannot come to a unanimous decision for Counts 1, 2, and 3? Do we still move on to the lesser charge? Or do we continue to deliberate until we are unanimous?" Without consulting the parties, the court responded to the jury in writing: "You should work to come to a unanimous verdict on Counts 1, 2, and 3. However, if you cannot come to a unanimous verdict on Counts 1, 2, and 3, you may move on to Counts 4 and 5." The jury returned their verdict shortly thereafter.

¶15 Sinz was convicted of Count I: Sexual Intercourse Without Consent as to D.B; Count II: Sexual Intercourse Without Consent as to K.B; Count III: the lesser-included

6

offense of Sexual Assault as to K.B.; Count IV: Sexual Assault as to K.B.; and Count V: Sexual Assault as to D.B.

¶16 After the jury was excused, the court advised the parties about the jury's second question and explained, "I took it upon myself to answer it." Sinz did not object or raise any concerns regarding the court answering the jury's question without consulting the parties.

¶17 On January 10, 2019, Sinz was sentenced to serve 210 years in Montana State Prison, with 100 years suspended.

**STANDARDS OF REVIEW**

¶18 Ineffective assistance of counsel (IAC) claims present mixed questions of law and fact and are reviewed de novo. *State v. Ward*, 2020 MT 36, ¶ 15, 399 Mont. 16, 457 P.3d 955. We "review IAC claims on direct appeal if the claims are based solely on the record." *Ward*, ¶ 15.

¶19 Generally, this Court will not address issues raised for the first time on appeal. *State v. Christensen*, 2020 MT 237, ¶ 12, 401 Mont. 247, 472 P.3d 622. However, we may invoke plain error review for claimed errors that implicate a criminal defendant's fundamental constitutional rights when failing to review the claimed error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process. *Christensen*, ¶ 12 (citing *State v. Taylor*, 2010 MT 94, ¶ 12, 356 Mont. 167, 231 P.3d 79).

7

¶20    Whether a criminal defendant's constitutional rights were violated is a question of constitutional law over which this Court exercises plenary review. *State v. Hatfield*, 2018 MT 229, ¶ 16, 392 Mont. 509, 426 P.3d 569.

## DISCUSSION

¶21    *Issue One: Whether Sinz received ineffective assistance of counsel.*

¶22    To establish a claim for IAC, a defendant must prove both (1) that counsel's performance was deficient and (2) that counsel's deficient performance prejudiced the defense. *Whitlow v. State*, 2008 MT 140, ¶ 10, 343 Mont. 90, 183 P.3d 861. IAC claims may be raised on direct appeal when the record sufficiently answers why counsel did or did not take a particular course of action. *Ward*, ¶ 18. "If it is not apparent from the record why counsel took a particular course of action, IAC claims may be more appropriate for review in a petition for postconviction relief." *Ward*, ¶ 18 (citing *State v. Hinshaw*, 2018 MT 49, ¶ 21, 390 Mont. 372, 414 P.3d 271; *Rose v. State*, 2013 MT 161, ¶ 18, 370 Mont. 398, 304 P.3d 387); *see also* §§ 46-21-101-203, MCA (governing proceedings for postconviction relief). "Claims involving alleged omissions of trial counsel are often ill-suited for consideration on direct appeal." *Hinshaw*, ¶ 21 (citing *State v. Briscoe*, 2012 MT 152, ¶ 10, 365 Mont. 383, 282 P.3d 657.

¶23    Sinz asserts he received ineffective assistance of counsel because his trial attorney failed to sufficiently question juror D.C. regarding potential bias, did not seek to remove D.C. for cause, and did not exercise a peremptory challenge. Sinz argues that his attorney's failure to remove a "presumptively biased juror" created a structural defect in the trial, requiring automatic reversal, because D.C. ultimately served as jury foreman. The State

8

argues that this Court should not address Sinz's IAC claim on direct appeal because the record is silent regarding the reasons for defense counsel's alleged omissions. We agree.

¶24 "When considering whether to review an IAC claim on direct appeal, we first must determine whether the claim is based on the trial record." *State v. Sawyer*, 2019 MT 93, ¶ 13, 395 Mont. 309, 439 P.3d 931. If the reasons for defense counsel's actions or inactions are apparent from the record, we may address an IAC claim on direct appeal. *Sawyer*, ¶ 13. "Conversely, if the claim is based on matters outside the record, we will not review it on direct appeal, recognizing that the defendant may raise the issue in a postconviction proceeding to develop a record as to the reasons for counsel's actions." *Ward*, ¶ 20 (citing *Sawyer*, ¶ 13).

¶25 Sinz argues his IAC claim is appropriate for review on direct appeal because there is no plausible justification for his counsel's failure to remove D.C. from the jury. But as the State points out, there are several strategic reasons why Sinz's counsel may have thought it was advantageous to keep D.C. on the jury. For example, perhaps counsel believed that D.C.'s prior jury experience in the DUI trial would be favorable to the defense given his description of the need for "video evidence" to reach a guilty verdict in that case. Sinz's argument fails to account for the variables defense counsel was considering in choosing how to exercise peremptory challenges.

¶26 Ultimately, we can only speculate as to why counsel did not inquire further into D.C.'s potential bias, exercise a peremptory challenge, or otherwise seek his removal for cause. Sinz's claim is better suited for consideration in postconviction proceedings where

9

a record may be developed as to the reasons for counsel's actions and inactions. We therefore decline to review Sinz's IAC claim on direct appeal.

¶27 *Issue Two: Whether this Court should exercise plain error review regarding Sinz's claims about expert testimony undermining his presumption of innocence.*

¶28 "Absent plain error, allegations that constitutional rights have been violated cannot be raised for the first time on appeal." *Christensen*, ¶ 78 (citing *State v. Minez*, 2004 MT 115, ¶ 30, 321 Mont. 148, 89 P.3d 966). This Court will invoke plain error review only when the appellant demonstrates both that (1) the alleged error implicates a fundamental right and (2) failure to review the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or compromise the integrity of the judicial process. *State v. Akers*, 2017 MT 311, ¶ 10, 389 Mont. 531, 408 P.3d 142. Plain error review is discretionary and exercised "sparingly, on a case-by-case basis, according to narrow circumstances, and by considering the totality of the circumstances." *State v. Haithcox*, 2019 MT 201, ¶ 23, 397 Mont. 103, 447 P.3d 452 (citation omitted).

¶29 Sinz argues that plain error review is appropriate because Dr. Dutton's testimony amounted to a "recitation of statistical data," which undermined the presumption of innocence and implicated a fundamental right. Sinz contends that testimony such as Dr. Dutton's forces a criminal defendant to undergo trial "presumptively guilty, on account of his case sharing typical features gleaned from general research on the kind of crime with which he is charged." The State argues that Sinz's failure to assert an objection at trial

10

constitutes a waiver of this issue on appeal, and the requirements for plain error review are not satisfied. We agree.

¶30 An expert witness may testify about scientific, technical, or other specialized knowledge if it will help the jury understand the evidence or determine a fact in issue. M. R. Evid. 702. We have consistently upheld the use of expert testimony to explain complexities of child sexual abuse and to give guidance, which help jurors understand and judge the victim's testimony. *State v. Reams*, 2020 MT 326, ¶ 15, 402 Mont. 366, 477 P.3d 1118; *State v. Robins*, 2013 MT 71, ¶ 16, 369 Mont. 291, 297 P.3d 1213; *State v. Morgan*, 1998 MT 268, ¶ 29, 291 Mont. 347, 968 P.2d 1120. In sexual abuse cases, we limit the introduction of false reporting statistics as an "improper comment on the credibility" of the victim. *State v. Brodniak*, 221 Mont. 212, 222, 718 P.2d 322, 329 (1986); *State v. Grimshaw*, 2020 MT 201, ¶ 24, 401 Mont. 27, 469 P.3d 702 (expert testimony that "only between two and eight percent of sexual assault reports are false" was an improper comment on victim credibility). We distinguish allowable "educational testimony regarding general causes of false reports in child sexual abuse cases" from "statistical testimony regarding false reporting" which is disallowed. *Reams*, ¶ 16 n. 1.

¶31 Dr. Dutton did not provide statistical testimony nor undermine his presumption of innocence. Dr. Dutton's testimony was educational in nature, as she explained the process of victimization, testified to general causes of false reports in child sexual abuse cases, and discussed general issues underlying sexual abuse disclosures. Dr. Dutton did not comment on the facts of the case or provide an opinion about whether K.B. and D.B. had been abused. The suggestion that Sinz's case may share some similarities with Dr. Dutton's research

11

does not render her testimony improper or inadmissible. Furthermore, the jury received an instruction that Dr. Dutton's testimony may not be considered "to be an opinion by her that D.B. and K.B. have told the truth." We presume that juries follow instructions provided by the court. *State v. Sanchez*, 2008 MT 27, ¶ 57, 341 Mont. 240, 177 P.3d 444.

¶32 Sinz has not established that Dr. Dutton's testimony was improper or infringed upon a fundamental right. We therefore decline to exercise plain error review.

¶33 *Issue Three: Whether the District Court erred by answering a jury question during deliberation without consulting the parties.*

¶34 Sinz argues that his right to be present at a critical stage of the proceedings was violated when the District Court answered the jury's second written inquiry without consulting the parties, and that such violation constituted reversible error.

¶35 The Montana Constitution and the United States Constitution provide a defendant the right to be present at all critical stages of the criminal proceedings against him. *State v. Northcutt*, 2015 MT 267, ¶ 6, 381 Mont. 81, 358 P.3d 179 (citing Mont. Const. art. II, § 24); *United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 1484 (1985) (per curiam). A reversible violation of this right occurs when (1) the defendant is excluded from a critical stage of the proceedings, and (2) prejudice results. *Northcutt*, ¶ 6. When a defendant was not prejudiced by his absence from an event, this Court need not determine whether that event constituted a critical stage. *See State v. Wilson*, 2013 MT 70, ¶ 13, 369 Mont. 282, 297 P.3d 1208. Right of presence claims are subject to harmless error analysis. *Northcutt*, ¶ 11 (citing *State v. Reim*, 2014 MT 108, ¶¶ 36-40, 374 Mont. 487, 323 P.3d 880).

12

¶36 Sinz relies on *State v. Tapson*, 2001 MT 292, 307 Mont. 428, 41 P.3d 305, to argue that the District Court committed reversible error by responding to the jury's inquiry without consulting the parties. Sinz's reliance on *Tapson* is misplaced.

¶37 In *Tapson*, we overturned a verdict where the district court judge entered the jury room during deliberations, without the defendant or counsel present, and no record existed as to what transpired between the judge and jury. *Tapson*, ¶¶ 31-33. The lack of a record made it "impossible to say that, beyond a reasonable doubt, there was no prejudice to the defendant, and therefore harmless error." *Tapson*, ¶ 31 (quoting *Arizona v. Hilliard*, 651 P.2d 892, 897 (Ariz. Ct. App. 1982)).

¶38 "[W]e have repeatedly identified the lack of a record as a determinative factor in *Tapson*." *Northcutt*, ¶ 11 (citing *State v. Wilson*, 2013 MT 70, ¶ 27, 369 Mont. 282, 297 P.3d 1208 (contrasting the case before it with *Tapson*, in which "[t]he lack of a record prevented this Court from determining that no possibility of prejudice existed."); *State v. Riggs*, 2005 MT 124, ¶ 53, 327 Mont. 196, 113 P.3d 281 ("In *Tapson*, the judge's entry alone into the jury room could have prejudiced the defendant, and the deficit in the record made it impossible to say beyond a reasonable doubt that it did not."); *State v. Kennedy*, 2004 MT 53, ¶¶ 33-34, 320 Mont. 161, 85 P.3d 1279 (concluding that a judge's interaction with a juror was preserved in a record and was accordingly susceptible to review for prejudice)).

¶39 In *Northcutt* we affirmed a defendant's conviction, even though the judge interacted with the jury during deliberations without the defendant present, because the record established that the defendant was not prejudiced by the interaction. *Northcutt*, ¶¶ 16-23.

13

We reaffirmed *Tapson*'s holding that "the jury room door must remain closed to judges" but concluded that a defendant's absence from the interaction should be considered under a harmless error analysis. *Northcutt*, ¶¶ 16-18. Under this analysis, the State must demonstrate that "there is no reasonable possibility" that the defendant was prejudiced by his absence. *Northcutt*, ¶ 18 (quoting *State v. Matt*, 2008 MT 44, ¶ 38, 347 Mont. 530, 199 P.3d 244).

¶40 Unlike *Tapson*, there is a record of the District Court's interaction with the jury in this case, as both the jury's inquiry and the court's response were in writing. Accordingly, we look to the record to determine whether Sinz was prejudiced by the interaction. *Northcutt*, ¶ 12. In determining whether he was prejudiced, the issue is whether the court's response to the jury was incorrect as a matter of law.

¶41 The jury inquired: "What happens if we cannot come to a unanimous decision for Counts 1, 2, and 3? Do we still move on to the lesser charge? Or do we continue to deliberate until we are unanimous?" The District Court responded: "You should work to come to a unanimous verdict on Counts 1, 2, and 3. However, if you cannot come to a unanimous verdict on Counts 1, 2, and 3, you may move on to Counts 4 and 5."

¶42 As the State correctly notes, the court did not direct the jury to simply move on to the last two counts and not consider the lesser-included offenses for the first three counts. The court directed the jury to try and reach a unanimous verdict on the first three counts with no limitation on whether it was on the charged offense or lesser-included offense. This direction was consistent with the Jury Instructions. Our review of the record convinces us that there is not a reasonable possibility that Sinz was prejudiced.

14

Accordingly, to the extent the District Court erred by responding to the jury's inquiry in the parties' absence, such error was harmless.

## CONCLUSION

¶43　We decline to consider Sinz's IAC claim on direct appeal.

¶44　We decline to exercise plain error review regarding Sinz's claims about expert witness testimony undermining his presumption of innocence.

¶45　The District Court did not commit reversible error by answering the jury's question without consulting the parties.

¶46　We affirm.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON

15