DA 19-0420

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 238

FILED

09/21/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0420

STATE OF MONTANA,

       Plaintiff and Appellee,

   v.

CHARLES MICHAEL BYRNE,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Third Judicial District,
In and For the County of Powell, Cause No. DC-18-12
Honorable Ray J. Dayton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Haley Connell Jackson, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
Attorney General, Helena, Montana

          Kathryn McEnery, Powell County Attorney, Patrick Moody, Deputy
County Attorney, Deer Lodge, Montana

Submitted on Briefs:  June 23, 2021

Decided:  September 21, 2021

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 A jury convicted Charles M. Byrne in the Third Judicial District Court, Powell County, of three counts of felony sexual intercourse without consent (SIWC) with a victim twelve years old or younger, in violation of § 45-5-503(4)(a), MCA (2009). Byrne appeals his conviction and presents the following issue[1] for review:

> *Did eliciting testimony that vouched for M.G.'s credibility and personally commenting on M.G.'s reliability as a witness undermine Byrne's right to a fair trial?*

¶2 We reverse and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 In 2018, the State charged Byrne with three counts of felony SIWC for conduct that occurred between 2009 and 2011. The victim, M.G., was under the age of twelve at the time of the offenses and fifteen at the time of trial. Byrne denied the allegations.

**Motion in Limine**

¶4 Byrne filed a motion in limine to bar the State from eliciting lay or expert testimony vouching for M.G.'s credibility. In his motion, Byrne acknowledged that Montana allows expert witnesses to testify directly about the credibility of a victim who testifies in a child sexual abuse trial, but argued that, to render that opinion, the expert must be properly qualified, citing *State v. Scheffelman*, 250 Mont. 334, 342, 820 P.2d 1293, 1298 (1991) (citing *State v. Geyman*, 224 Mont. 194, 729 P.2d 475 (1986)). He moved the court to exclude opinion testimony of M.G.'s credibility without appropriate qualification of the

---

[1] Byrne raises an alternative argument regarding the District Court's restitution order. Because we are remanding for a new trial, we need not address the issue.

expert witness. The State responded that it "agree[d] that commenting on the victim's credibility is generally barred absent laying foundation for that opinion as an expert opinion" and that it did not intend to introduce such evidence. Later, the State confirmed that Byrne's motion to bar lay witnesses from proffering expert opinions was unopposed but stated that it "reserve[d] the right to proffer experts when proper foundation is laid." At a motions hearing, Byrne again reiterated that he was "trying to keep out the expert getting on the stand and saying this child is a credible witness . . . the stipulation by [the prosecutor] is that he will not be eliciting from the expert, you know, do you believe the child . . . ." The State assured the District Court and Byrne that it would not ask any questions regarding whether M.G. was credible:

> [Prosecutor]: I don't believe there's going to be any request uh, by the State to ask whether . . . the victim is, alleged victim, is believable or not. I think that's where the . . .
>
> [District Court]: Yeah.
>
> [Prosecutor]: concern is.

The court acknowledged a narrow exception to the rule that expert witnesses cannot testify to an alleged child victim's credibility but noted that a specific foundation must be laid first. The following exchange then occurred:

> [District Court]: But we don't—we're not even going to see any effort of that as I understand it.
>
> [Prosecutor]: No, no your honor. The, the closest thing that I could possibly see would be a request uh, from the uh, the woman who conducted the expert or the uh, forensic interview, of what was the child's demeanor at the time of the interview. Um, but again that is not asking uh, whether you believed her. It was, what did you observe? Uh, and then jury will be allowed to make their own conclusions from that your honor.

3

[District Court]: Alright, but in any event the State understands the uh, Defense's concerns and is in agreement?

[Prosecutor]: Uh, yes, your honor.

At the final pretrial hearing, the court noted that "the Defense motions uh, as to credibility and those kinds of things uh, are stipulated by the State . . ." and "[e]verybody knows what they can testify to and what they can't . . . [T]he counselor's not going to boost [M.G.'s] credibility." The District Court ruled that "[e]verything was stipulated and so all the motions that were made that were agreed to are granted."

¶5 During its opening statement at trial, the State emphasized that the important issue for the jury to decide was why M.G. would lie:

> [Prosecutor]: During the course of this testimony, I'm going to be asking you to evaluate one important question. Why would [M.G.] lie to you? Why would she subject herself to coming here and sitting in front of twelve strangers and telling you about the three worst days of her life? It's an important question.

The State then proceeded to question four of its witnesses regarding M.G.'s credibility. The following are relevant excerpts from the witnesses' testimony.

¶6 Wendy Dutton testified as a blind expert witness for the State. Among other topics, the State questioned Dutton about malicious false reports of sexual abuse and whether children ever misidentify their abuser. Though she did not give exact statistics, Dutton responded that it is "rare" and "doesn't happen very often."

> [Prosecutor]: Is it uh, at all normal for a child uh, according to the research, to be issuing false reports?

> [Dutton]: . . . The malicious false report tends to be rare.

. . .

4

[Prosecutor]: What about identifying the wrong person?

[Dutton]: Um, well it's, um we don't know a whole lot about that. Um, when children misidentify a perpetrator it's most often it was a stranger that eyewitness um, um, but since most children are abused by someone they know um, it's fairly rare when they will accuse somebody other than the actual perpetrator. And when it happens, we don't know much about it because there's not much research on it. It typically happens because the actual abuser coached the child and the tell - - saying it was somebody else or the child accuses somebody else who's less loved or less feared than the actual perpetrator.

[Prosecutor]: How rare is this?

[Dutton]: Again, it's, it doesn't happen very often so, it's not well studied.

Dutton qualified her statement, saying that little research has been done on the subject because controlled studies would be both unethical and illegal. The only studies that are conducted involve closed cases that were subsequently investigated and then determined to be malicious false reports. The characteristics of these post-hoc cases are then studied.

¶7 Fredericka Grunhuvd, a therapist who worked with M.G. for several years before and after the alleged abuse and who worked closely with M.G.'s family, testified about M.G.'s oppositional defiance disorder diagnosis and a disclosure M.G. made to Lisa (M.G.'s mother) about inappropriate touching.

[Prosecutor]: Does oppositional defiance disorder uh, carry with it um - - let me rephrase that one. Did [M.G.] present signs of extreme dishonesty?

[Grunhuvd]: No.

[Prosecutor]: How about manipulation?

[Grunhuvd]: No.

5

On cross-examination, defense counsel attempted to clarify Grunhuvd's testimony and asked if M.G. showed signs of untruthfulness.

> [Defense Counsel]: So, [M.G.] did have some ex . . ., um behaviors that exhibited as untruthfulness, is that fair?
>
> [Grunhuvd]: Rarely.
>
> [Defense Counsel]: Okay. Different than extreme though, so I'm, I'm going to assume and you tell me if I'm wrong. When you said no, to [the prosecutor's] question, there was nothing extreme that concerned you as [her therapist]?"
>
> [Grunhuvd]: Correct.
>
> [Defense Counsel]: And would you describe it then as more um, typical for her age?
>
> [Grunhuvd]: Yes.
>
> [Defense Counsel]: Okay. So, minimal um, regarding [un]truthfulness?
>
> [Grunhuvd]: Very minimal.

On redirect, the State referred to Grunhuvd's testimony about M.G.'s "rare untruthfulness."

> [Prosecutor]: [W]as the untruthfulness you saw like age appropriate untruthfulness?
>
> [Grunhuvd]: Yes.
>
> [Prosecutor]: Do any of those stick in your mind that you could give an example of?
>
> [Grunhuvd]: Um, there was some lying about homework um . . .
>
> [Prosecutor]: My goodness.
>
> [Grunhuvd]: there was uh, I think she stole a toy from [her brother] and then lied about it.
>
> .    .    .

6

[Prosecutor]: Was there anything more extreme than uh, dishonesty about turning in her homework?

[Grunhuvd]: No.

¶8 Jane Hammett, a registered nurse who conducted M.G.'s forensic interview and medical exam, testified as an expert about her findings. The State asked Hammett if during the forensic interview she saw signs of dishonesty.

[Prosecutor]: [D]id you ever see signs of dishonesty or that [M.G.] had been coached?

[Hammett]: No.

¶9 Finally, Gina Dalrymple, a therapist who worked with M.G. after the alleged abuse, also testified about her therapy sessions with M.G. Dalrymple testified that on one occasion she had a conversation with M.G. about the allegations against Byrne, though M.G. did not provide details.

[Prosecutor]: Did you um, see any signs of manipulation out of [M.G.] when she was talking about [the reported allegations]?

[Dalrymple]: No.

[Prosecutor]: Did you see any signs of, that uh, she was being dishonest with you?

Defense counsel objected, but the District Court overruled without explanation. Dalrymple responded, "No."

**Testimony Regarding SIWC Incidents**

¶10 At trial, Lisa testified that while living in Deer Lodge, M.G.'s family became friends with Byrne, his wife Rachel, and their two children. The families got along well, spent weekends and holidays together, and were generally close. At the time of trial, M.G. was

7

a sophomore in high school and did not remember what Byrne looked like and had trouble recognizing him in the courtroom.

¶11     M.G. testified that Byrne sexually abused her on three different occasions while she lived in Deer Lodge.  She initially testified that she did not know what grade she was in when these incidents occurred, but later recalled telling the forensic interviewer that she was between six and seven years old.  M.G. said that one of the incidents occurred at Byrne's house.  She initially testified that she did not remember if anyone other than Rachel was at the house when the incident occurred, but later testified on cross-examination that her brother, mom, and the Byrnes' two children were also there.  M.G. testified that the incident occurred after Rachel asked M.G. to grab something out of Rachel's bedroom.  M.G. said Byrne followed her into the room, lifted her onto the bed, and put his fingers inside her vagina.  M.G. did not remember what she was wearing or if Byrne removed her clothes or his clothes.  M.G. thought she may have screamed during the incident, however, on cross-examination, she said she was only fifty percent sure that she did.  She testified that the bedroom door was open the entire time.  After the incident, M.G. went with the Byrne family to a shooting range.  M.G. initially testified that she did not know what time of the year this incident occurred, but during cross-examination said she remembered telling the forensic interviewer that it was fall.

¶12     M.G. testified that a second incident occurred at her house during a family gathering.  She initially testified that it was a holiday, but later acknowledged that she told the forensic interviewer she did not know if it was a holiday.  M.G. testified that her mom had asked her to grab something out of her upstairs bedroom.  She said Byrne picked her

8

up, carried her up the stairs, put her on Lisa's bed, and penetrated her with his fingers and penis. M.G. could not recall if Byrne took off her shirt or his clothes. After the incident, M.G. testified that she went downstairs and acted like everything was normal. Lisa recalled a Thanksgiving at which she asked M.G. to clean her room and she remembered Byrne going upstairs after M.G. to help her. Lisa did not think anything of it at the time and M.G. never said anything to her when she came back downstairs. M.G.'s cousin remembered seeing M.G. upset and crying when she returned downstairs, but he believed it was due to M.G. not wanting to clean her room. Rachel and Lisa's former boyfriend also recalled Byrne going upstairs with M.G. but did not testify to observing anything unusual.

¶13 M.G. testified that the third incident occurred at her house. She did not remember what time of day or year it occurred and said she had no idea how old she was when the incident occurred. She did recall that her family, Lisa's former boyfriend, and the Byrne family were all at her house at the time. She testified that she was changing out of her pajamas in Lisa's bedroom when Byrne came into the room, pulled off her underwear and pants, and put his penis inside her vagina. After the incident, M.G. went downstairs and acted normal.

¶14 M.G.'s family moved to Drummond in 2011 after M.G. finished second grade. Lisa moved to Kalispell when M.G. was in eighth grade and M.G. moved in with a family friend, Dee Allen, so she could finish the school year in Drummond. M.G. moved to Kalispell to attend high school the following year. Dee noticed that M.G. occasionally wet the bed, and she testified that it happened quite often right after M.G. moved in with Dee. Dee thought it was due to M.G. transitioning to a new house and not being with her family.

9

Dutton, the State's blind expert, testified that bed wetting can be a symptom of sexual abuse but acknowledged it does not mean one was sexually abused and can be caused by other things. Susan Keller, M.G.'s counselor in Kalispell, also testified that bed-wetting could be associated with an anxiety disorder. Keller diagnosed M.G. with generalized anxiety disorder after M.G. moved to Kalispell. When M.G. was living with Dee, M.G. told Dee that her mom was very protective of her because her mom was abused when she was little. M.G. then told Dee that she, M.G., had been sexually abused as well. Dee notified Lisa, who contacted law enforcement. M.G. had a forensic interview but declined a physical examination. About a year later, M.G. agreed to a physical examination but it revealed no significant findings. Law enforcement interviewed Byrne, who denied the allegations.

¶15 At trial, Byrne did not testify on his own behalf nor did he call witnesses.

**Closing Argument Statements**

¶16 During closing argument, the State reminded the jury that why M.G. would lie was critical to its decision of whether or not to convict Byrne. The prosecutor stated, "You don't have to believe anybody who testified. You get to choose [who] you believe. This is important, because that question of why did, why would [M.G.] lie is going to be key to your entire decision." The State acknowledged that the trial testimony "was not clean. It was not pretty . . ." and that M.G.'s memory was "not great." But the prosecutor then told the jury that M.G. was "a reliable witness." The prosecutor also emphasized Dutton's testimony, telling the jury that "it is incredibly rare for a person to mistake the identity of the [perpetrator]" and that it "is an incredibly rare instance."

10

¶17 At the conclusion of the three-day trial, the jury found Byrne guilty of all three charges. For each count, the District Court sentenced Byrne to 100 years to the Montana State Prison with a fifty-year parole restriction. Byrne appeals.

**STANDARDS OF REVIEW**

¶18 If a prosecutor's improper comments prejudice a defendant's right to a fair trial, reversal is the proper remedy. *State v. Sanchez*, 2008 MT 27, ¶ 51, 341 Mont. 240, 177 P.3d 444; *State v. Hayden*, 2008 MT 274, ¶ 27, 345 Mont. 252, 190 P.3d 1091 ("A prosecutor's misconduct may be grounds for reversing a conviction and granting a new trial if the conduct deprives the defendant of a fair and impartial trial."). We use a two-step analysis to determine whether improper comments have prejudiced a defendant's right to a fair trial. We first determine whether the prosecutor made improper comments, and, if so, we then determine whether those comments prejudiced the defendant's right to a fair trial. *Sanchez*, ¶ 51 (citing *State v. Gladue*, 1999 MT 1, ¶ 12, 293 Mont. 1, 972 P.2d 827). We will not presume a prosecutor's improper comments prejudiced the defendant. *Gladue*, ¶ 27. "Rather, a defendant must demonstrate, based on the record, that the prosecutor's improper comments prejudiced his or her right to a fair and impartial trial." *Gladue*, ¶ 27 (citations omitted). When determining whether prejudice resulted, the improper comments must be viewed in the context of the case in its entirety. *State v. Wing*, 2008 MT 218, ¶ 33, 344 Mont. 243, 188 P.3d 999.

## DISCUSSION

¶19 *Did eliciting testimony that vouched for M.G.'s credibility and personally commenting on M.G.'s reliability as a witness undermine Byrne's right to a fair trial?*

¶20 Initially, we must determine whether the issue was preserved for review on appeal. Generally, a defendant must make a timely objection to properly preserve an issue for appeal. *State v. Favel*, 2015 MT 336, ¶ 17, 381 Mont. 472, 362 P.3d 1126 (citation and quotation marks omitted); *see also* § 46-20-104(2), MCA. However, "we have carved out an exception to the general rule under which a motion in limine may preserve an issue for appeal in some instances even though a contemporaneous objection to an alleged error is not made at trial." *Favel*, ¶ 17 (citation and internal quotation marks omitted). Though Byrne needed to object at trial to preserve his claim of prosecutorial misconduct, we have permitted a motion in limine to preserve an issue on appeal when the district court is "directly faced with the question" and has provided a "definitive ruling" on the issue. *Favel*, ¶¶ 19, 21; *see, e.g., Anderson v. BNSF Ry.*, 2015 MT 240, 380 Mont. 319, 354 P.3d 1248; *Peterson-Tuell v. First Student Transp., LLC*, 2014 MT 307, 377 Mont. 113, 339 P.3d 16; *State v. Crider*, 2014 MT 139, 375 Mont. 187, 328 P.3d 612; *State v. Vukasin*, 2003 MT 230, 317 Mont. 204, 75 P.3d 1284. Moreover, we have repeatedly held that a party need not make a contemporaneous objection if the objection would be redundant of a motion in limine. *Anderson*, ¶ 77. We recognize that "a party may not wish to register an objection in the presence of the jury for tactical reasons, yet may wish to preserve the objection on appeal." *Crider*, ¶ 19. Further, a party raising an

objection "need not continually renew the objection to preserve alleged errors for appeal." *Hulse v. Dep't of Justice*, 1998 MT 108, ¶ 46, 289 Mont. 1, 961 P.2d 75.

¶21 Here, Byrne's motion in limine adequately preserved the issue for appeal. The State stipulated to the motion and reassured the court and Byrne that it would not seek to bolster M.G.'s credibility—both in its response to Byrne's motion and at a pretrial motions hearing—and the District Court clarified that the parties were in agreement on the issue. At the final pretrial conference, the District Court ordered that all stipulated motions were granted, including Byrne's motion in limine. The District Court was directly faced with the question, and it definitively ruled on the issue by acknowledging that the motion was stipulated to and subsequently granting all stipulated motions. Byrne moved to preclude the State from bolstering M.G.'s credibility through his motion in limine. A contemporaneous objection to each violation here would prove unnecessarily redundant. *See Anderson*, ¶ 77.

¶22 Our decision in *State v. Partin* proves analogous to the instant case. 287 Mont. 12, 951 P.2d 1002 (1997). In *Partin*, the defendant moved in limine to exclude testimony of Partin's prior bad acts. 287 Mont. at 14, 951 P.2d at 1003. The State stipulated to the motion, assured the District Court that it would not elicit testimony on Partin's prior bad acts, and indicated that it had warned witnesses not to mention the acts. *Partin*, 287 Mont. at 14, 951 P.2d at 1003. At trial, the State introduced testimony concerning Partin's prior bad acts but contended that a cautionary instruction would correct the error. *Partin*, 287 Mont. at 14-15, 951 P.2d at 1003. On appeal, we reversed Partin's conviction. *Partin*, 287 Mont. at 18, 951 P.2d at 1005. In so doing, we noted that the

13

admission of the evidence violated the motion in limine and that, due to the weak nature of the evidence against Partin, a reasonable possibility existed that the evidence contributed to his conviction. *Partin*, 287 Mont. at 18, 951 P.2d at 1006. We noted that the State's acquiescence to the motion in limine conceded the prejudicial effect of the evidence and the State's subsequent violation "may have buttressed the officer's other testimony and, at the same time, impugned the defendant's credibility and character." *Partin*, 287 Mont. at 20, 951 P.2d at 1007. Finally, we concluded that, because the State agreed to the motion in limine, "resolving any doubt about the efficacy of the cautionary instruction in favor of the prosecution would be inappropriate." *Partin*, 287 Mont. at 22, 951 P.2d at 1008. As in *Partin*, the State stipulated to Byrne's motion in limine and conceded that M.G.'s credibility was critical to the case. The State assured the District Court and Byrne that it would not elicit credibility boosting testimony. Like *Partin*, the only direct evidence against Byrne came from M.G.'s testimony, and a reasonable possibility exists that the jury found M.G. more credible after hearing several witnesses testify to her credibility. *Partin* may be distinguished on the grounds that Partin objected and moved for a mistrial. However, the underlying reasoning remains the same: when the State stipulates to a motion in limine and subsequently reneges on its word, "resolving any doubt . . . in favor of the prosecution would be inappropriate." *Partin*, 287 Mont. at 22, 951 P.2d at 1008. Byrne adequately preserved the issue. We move now to whether he received a fair trial.

¶23     Both the Sixth Amendment of the United States Constitution and Article II, Section 24, of the Montana Constitution guarantee criminal defendants the right to a fair trial by a jury. We have consistently held that "the determination of the credibility of witnesses and the weight to be given their testimony is solely within the province of the jury." *State v. Brodniak*, 221 Mont. 212, 222, 718 P.2d 322, 329 (1986). A witness may not comment on the credibility of another witness's testimony, nor can a prosecutor elicit such testimony. *Hayden*, ¶¶ 26, 31 (citing *State v. St. Germain*, 2007 MT 28, ¶ 27, 336 Mont. 17, 153 P.3d 591; *State v. Hensley*, 250 Mont. 478, 481, 821 P.2d 1029, 1031 (1991)). This Court has also emphasized that it is improper for a prosecutor to offer personal opinions as to witness credibility. *State v. Aker*, 2013 MT 253, ¶ 26, 371 Mont. 491, 310 P.3d 506 (prosecutor argued that its witness told the jury her story "for the simple reason that she was telling [the jury] the truth; no motive, no other reason" and that the defendant's witnesses had "come into this courtroom and lied"); *State v. Lacey*, 2012 MT 52, ¶ 17, 364 Mont. 291, 272 P.3d 1288 (prosecutor argued that the State's witness was "candid," whereas the defendant was not candid and was, "by God," guilty); *State v. McDonald*, 2013 MT 97, ¶ 14, 369 Mont. 483, 299 P.3d 799 (prosecutor argued that the State's witnesses were "completely believable" and "telling [the jury] the truth"); *State v. Thorp*, 2010 MT 92, ¶ 26, 356 Mont. 150, 231 P.3d 1096 (prosecutor told the jury that the victim was "a very credible witness" who had "no reason to lie" and that the jury should believe the victim); *State v. Racz*, 2007 MT 244, ¶ 36, 339 Mont. 218, 168 P.3d 685 (prosecutor stated that the State's witness had "no reason to lie," was "honest," and "told the truth").

15

¶24    It is reversible error for a prosecutor to comment directly on a witness's credibility. *State v. Stringer*, 271 Mont. 367, 380-81, 897 P.2d 1063, 1071-72 (1995).  A prosecutor's personal opinions are improper for the following reasons:

> (1) a prosecutor's expression of guilt invades the province of the jury and is an usurpation of its function to declare the guilt or innocence of an accused; (2) the jury may simply adopt the prosecutor's views instead of exercising their own independent judgment as to the conclusions to be drawn from the testimony; and (3) the prosecutor's personal views inject into the case irrelevant and inadmissible matters or a fact not legally proved by the evidence, and add to the probative force of the testimony adduced at the trial the weight of the prosecutors' personal, professional, or official influence.

*Stringer*, 271 Mont. at 381, 897 P.2d at 1071-72 (citing *State v. Campbell*, 241 Mont. 323, 328-29, 787 P.2d 329, 332-33 (1990)).  As we stated in *Stringer*, 271 Mont. at 381, 897 P.2d at 1072, "[t]his Court has been unequivocal in its admonitions to prosecutors to stop improper comment and we have made it clear that we will reverse a case where counsel invades the province of the jury . . . ."

¶25    The prohibition on prosecutors eliciting testimony about the credibility of a witness also applies to expert testimony on the credibility of a victim.  *State v. Grimshaw*, 2020 MT 201, ¶ 21, 401 Mont. 27, 469 P.3d 702; *Brodniak*, 221 Mont. at 222, 718 P.2d at 329.  Improper expert vouching includes testimony on false accusations that imply the alleged victim is or is not telling the truth.  *Grimshaw*, ¶ 23 (citing *Brodniak*, 221 Mont. at 222, 718 P.2d at 329).  In *Grimshaw*, the prosecutor elicited testimony from its blind expert witness on rape myths and the behaviors of victims during a SIWC trial. *Grimshaw*, ¶ 22.  The prosecutor also asked the expert about false reporting statistics, and the expert testified that between two and eight percent of sexual assault reports are false.

16

*Grimshaw*, ¶ 22. The Court held that such testimony "clearly commented on, and improperly bolstered, the credibility" of the alleged victim's testimony. *Grimshaw*, ¶ 24. Because the case was a "he said-she said" case that turned solely on the credibility of the parties and "which party the jury believe[d]," the Court concluded the improper vouching "tipped the scales to an unfair trial." *Grimshaw*, ¶¶ 32-33; *see also Brodniak*, 221 Mont. at 222, 718 P.2d at 329 (holding that an expert witness's testimony in a sexual assault case on "the statistical percentage of false accusations was improper comment on the credibility" of the alleged victim).

¶26 This Court has applied a narrow exception to the general rule that an expert witness may not comment on the credibility of an alleged victim's testimony—the exception being when (1) the alleged victim is a "very young" child at the time of trial, (2) he or she testifies at trial, (3) he or she "exhibits contradictory behavior," and (4) when the expert is "properly qualified." *Rogers v. State*, 2011 MT 105, ¶ 26, 360 Mont. 334, 253 P.3d 889; *Hensley*, 250 Mont. at 481-82, 821 P.2d at 1031-32; *Scheffelman*, 250 Mont. at 342, 820 P.2d at 1298. We held in *Hensley*, 250 Mont. at 481-82, 821 P.2d at 1031-32, however, that the exception did not apply when the accuser was sixteen years old at trial even though the abuse occurred four years prior to her reporting. Here, the State did not argue below that any of the witnesses' testimony would be admissible under this exception, nor could it, as M.G. was not a "very young" child at the time of trial. M.G. was fifteen years old and none of the witnesses were deemed "properly qualified" to give an opinion on her credibility.

17

¶27 On appeal, Byrne argues that the State's questioning of its expert witnesses, which bolstered M.G.'s credibility and the prosecutor's statement during closing argument that M.G. was a "reliable witness," undermined Byrne's right to a fair trial. We agree. After assuring the court and Byrne before trial that the State would not elicit any testimony on witness credibility, the prosecutor questioned Grunhuvd, Hammett, and Dalrymple on M.G.'s credibility, eliciting their impressions of the credibility of her statements about the incidents and M.G.'s general predisposition towards being truthful. Further, the State elicited expert testimony from Dutton that improperly bolstered M.G.'s credibility with scientific probability evidence. *See Grimshaw*, ¶ 24; *Brodniak*, 221 Mont. at 222, 718 P.2d at 329. The State asked Dutton whether malicious false reports of sexual abuse are "normal," to which Dutton responded that they are "rare." When pressed by the prosecutor, "How rare is this?" Dutton testified, "It doesn't happen very often." Like the statistical evidence in *Grimshaw* and *Brodniak*, the expert's testimony that malicious false reports are "rare," and misidentification of abusers "doesn't happen very often," clearly commented on and improperly bolstered M.G.'s credibility. *Grimshaw*, ¶ 24; *Brodniak*, 221 Mont. at 222, 718 P.2d at 329. Similar to the expert's testimony in *Grimshaw* that a low percentage of false reports implied a high percentage that the alleged victim was telling the truth, Dutton's testimony that false reports are "rare" implied that M.G. was telling the truth. *See Grimshaw*, ¶ 32. This type of credibility-boosting expert testimony is improper. *Grimshaw*, ¶ 25. It makes no meaningful difference whether she couched her opinion in terms of percentages or probabilistic descriptors. Like *Grimshaw*, this case ultimately came down to a "he said/she said" contest based on M.G.'s credibility.

18

*Grimshaw*, ¶ 33. The function of Dutton's testimony remained that it was very unlikely M.G. was lying because false reports are rare and misidentification of the victim's abuser "doesn't happen very often."

¶28 The dissent points to our recent decision in *State v. Sinz*, another case involving Dutton's testimony, to support its conclusion that Dutton's testimony was permissible in the instant case. 2021 MT 163, 404 Mont. 498, 490 P.3d 97. In *Sinz*, Dutton provided general information about child sexual abuse cases and repeatedly emphasized that she was not commenting on the credibility of the children in the case. *Sinz*, ¶ 9. Specifically, Dutton testified that, from a comparative standpoint, "malicious false report[s] . . . tend[] to be more rare" than the "more common" erroneous false allegations where a normal and innocuous explanation for the child's statements exists. *Sinz*, ¶ 10. On cross-examination, Dutton reiterated that she was not testifying to comment on the credibility of the children or offer an opinion on the allegations in the case. *Sinz*, ¶ 11. The prosecutor's closing argument further emphasized that Dutton was not testifying to comment on the children's credibility. *Sinz*, ¶ 12. We rejected Sinz's argument that Dutton's testimony amounted to a recitation of statistical data that warranted plain error review and concluded that Sinz had failed to establish that Dutton's testimony was improper. *Sinz*, ¶¶ 29-32. We further noted that the jury received an instruction that Dutton's testimony was not to be considered an opinion by her that the children in *Sinz* told the truth. *Sinz*, ¶ 31. Dutton's testimony in *Sinz* proves distinguishable. First, Dutton repeatedly reiterated in *Sinz* that she was not there to comment on the alleged victims' credibility. No such assurances came in this case, beyond Dutton's initial statement that she was testifying as a blind witness. Second, the

19

prosecutor amplified, and to some extent distorted, Dutton's testimony in his closing argument. During its closing argument, the State reminded the jury that Dutton had testified that "it is *incredibly* rare for a person to mistake the identity of the [perpetrator]" (emphasis added). In fact, Dutton's testimony, when asked about identifying the wrong person, was that "it's *fairly* rare when they will accuse somebody other than the actual perpetrator" (emphasis added). While this may appear to be a matter of semantics, in the context of the trial, the prosecution's emphasis on M.G.'s credibility, and the inherent degree of difference between "incredibly rare" and "fairly rare", the prosecutor's choice of adverb proves consequential. Similarly, we construe Dutton's testimony in *Sinz* that, comparatively, one type of false allegation is "more rare" relative to a different type of false allegation as distinct from her testimony here that false allegations in general are rare and that misidentifying the perpetrator does not occur very often. Finally, no such jury instruction was given by the District Court regarding Dutton's testimony at Byrne's trial. For these reasons, we distinguish Dutton's testimony in *Sinz*. However, even if Dutton's testimony here was not distinguishable and thus passed muster, the State improperly bolstered M.G.'s credibility through other witnesses.

¶29     In direct contravention of the State's agreement not to propound credibility boosting testimony, the State's witness, Grunhuvd, a therapist, testified that M.G. did not present "signs of extreme dishonesty" or of "manipulation," and that any untruthfulness was age appropriate. Hammett, a registered nurse, testified that she saw no signs of dishonesty or that M.G. had been coached when she conducted M.G.'s forensic interview. Dalrymple, a therapist, testified that she did not see any signs of manipulation or that M.G. was being

20

dishonest when M.G. spoke to her about the allegations. This testimony, elicited by the State, constituted direct comments from the witnesses about M.G.'s credibility. The comments were designed to bolster M.G.'s credibility by having these witnesses, who were experts in their fields, testify that they had no reason to question the truthfulness of M.G.'s allegations. They were not questions elicited for the purpose of educating the jury on, for example, why a victim would delay in reporting or why a child would be unaware of the criminality of the abuser's conduct. They were questions concerning M.G.'s truthfulness and credibility—a subject committed to the jury and one that a jury can evaluate through their collective common experience. The purpose of the testimony was to tell the jury that they should believe M.G. because these trained professionals found no reason to disbelieve M.G. "[E]xpert testimony regarding credibility invades the jury's function by placing a stamp of scientific legitimacy on the victim's allegations." *Stringer*, 271 Mont. at 377, 897 P.2d at 1069. The question of whether to believe M.G. was exclusively for the jury to decide and this testimony from three trained professionals that each found no reason to disbelieve M.G. improperly invaded that function. No meaningful distinction exists between couching the testimony in terms such as "no signs of dishonesty" and simply saying M.G. was honest.

¶30 Finally, the prosecutor personally commented on M.G.'s credibility during closing argument by calling M.G. a "reliable witness." This was significant in the context of the evidence and that the State's case rested entirely on the jury believing M.G. Right after reminding the jury that it got to decide which witnesses to believe and emphasizing to the jury that why M.G. would lie was "key to [the jury's] entire decision," the prosecutor told

21

the jury that M.G. was "a reliable witness" and reiterated multiple times that there was no incentive for M.G. to lie. Referring to M.G. as a "reliable witness" was a direct statement of the prosecutor's personal opinion that the jury should believe M.G. *Stringer*, 271 Mont. at 380, 897 P.2d at 1071. It is for the jury, not an attorney trying a case, to determine which witnesses are believable and whose testimony is reliable. *Hayden*, ¶ 32. We now turn to whether Byrne was prejudiced and his right to a fair trial violated.

¶31 The State argues that the detailed and compelling nature of M.G.'s testimony supports the conclusion that any improper questions or comments were harmless. It maintains that the jury was properly instructed that it could evaluate M.G.'s demeanor and "[w]hether the child impresses you as having an accurate memory and recollection. Whether the child impresses you as a truth-telling individual . . . ." The State maintains that unlike in *Hayden* where the alleged victim recanted at trial and the prosecutor attempted to bolster its case through the investigating officer, M.G. never wavered about the facts of Byrne's offense and her certainty that Byrne committed SIWC against her. The State further argues that other witnesses corroborated some of the facts surrounding one of the alleged incidents. In sum, the State maintains that the totality of the evidence presented shows that there was little potential prejudice from the prosecutor's comments.

¶32 We first note that this case does not involve one isolated improper vouching statement by one witness or one improper vouching comment during closing argument. Instead, this is a case in which multiple improper vouching statements occurred. "Repeated improper statements create cumulative prejudice, and we accordingly view them collectively rather than individually." *Anderson*, ¶ 78. When there are multiple errors

22

committed by the prosecutor, the cumulative effect of the misconduct leaves unsettled the question of the fundamental fairness of the proceedings. *Aker*, ¶ 28. Further, closing arguments pointing out inferences which can be drawn from the evidence presented are not improper. *Gladue*, ¶ 19. Though the State maintains on appeal that the detailed and compelling nature of M.G.'s testimony supported a conviction, the State conceded at trial that her testimony "was not clean" and "not pretty" and that M.G.'s memory was "not great." Jury instructions and prosecutorial comments to the jury that it is the jury's duty to evaluate the witnesses' credibility do not cure or erase the State's multiple improper questions to witnesses or comments made in closing arguments.

¶33 Here, the entire case hinged on M.G.'s credibility. There was no physical evidence, there were no eyewitnesses to the assaults, and there were no inculpatory statements. To meet its burden of proof, the prosecution's case ultimately relied on M.G.'s testimony and Byrne's general denial. The prosecution provided corroborating witnesses to circumstantial facts, but only M.G.'s testimony spoke directly to what occurred. The prosecution acknowledged that its case rested on the jury finding M.G. credible and stipulated that it would not seek to bolster M.G.'s credibility. Throughout the trial, the prosecutor repeatedly asked the jury some variation of "why would [M.G.] lie?" Isolated, the argument of "why would she lie" presents no issues. However, these repeated comments tend to place the burden on Byrne to account for and explain M.G.'s motive to testify. Moreover, "why would she lie" wrongly suggests that, if M.G. is not deliberately lying, then she *must* be telling the truth, and that if M.G. lacked an obvious incentive to lie, she *must* be sincere. Asking the jury repeatedly "why would [M.G.] lie?" invites the jury

23

to accept the prosecution's case unless Byrne provides some positive answer to that question. After Byrne's closing argument addressed the State's burden-shifting effort, the State acknowledged that the burden was not on Byrne to answer "why would she lie?" The prosecutor went further than pointing out permissible inferences. *See Gladue*, ¶ 19. The curative effect of mentioning the State's burden throughout trial and acknowledging that the burden remained with the State does not mitigate the prosecutor's repeated question of "why would she lie?"

¶34    Here, the jury could well have concluded that because multiple witnesses, trained in the fields in which they testified, and the prosecutor believed M.G. was telling the truth and Byrne was guilty, the jury too should believe M.G. and find Byrne guilty. *See State v. Lawrence*, 2016 MT 346, ¶ 18, 386 Mont. 86, 385 P.3d 968. ("When the prosecutor told the jury the presumption of innocence no longer existed and his lawyer raised no objection or argument in opposition to that assertion, the jury could well have concluded that the prosecutor was correct."). The jury could further conclude that, because Byrne failed to present a clear motive for M.G. to lie, that she *must* be telling the truth and that Byrne *must* be guilty. The dissent argues that, in context, the witnesses were not bolstering M.G.'s credibility as it related to her allegations against Byrne, but rather, were testifying about M.G.'s credibility in their dealings with M.G. This represents a narrow view that overlooks the effect of the State's witnesses and the prosecutor's vouching for M.G.'s credibility. As we noted in *Lawrence*, "[t]he prosecutor is the representative of the State at trial. . . [and] a prosecutor's improper suggestions and assertions to a jury are apt to carry much weight against the accused when they should properly carry none."

24

*Lawrence*, ¶ 20 (citations and quotations omitted). The jury was repeatedly informed that it was the sole judge of credibility. The jury also heard testimony from several witnesses for the State, over the course of a three-day trial, that M.G. was credible. It remains true that those witnesses testified to M.G.'s credibility in the context of their interactions with M.G. However, it remains just as true that, in a true credibility contest, the cumulative effect of the State's witnesses and the prosecutor's comments as the "representative of the State" shrouded the narrow context in which the witnesses were testifying, potentially leaving the jury with the broad takeaway that M.G. was credible. *See Lawrence*, ¶ 20. We further incorporate our discussion on *Partin*, *see supra* ¶ 22, and reiterate that, when the State stipulates to a motion in limine and subsequently reneges on its word, "resolving any doubt . . . in favor of the prosecution would be inappropriate." *Partin*, 287 Mont. at 22, 951 P.2d at 1008.

¶35 We conclude, based on the nature of the evidence, the credibility-boosting testimony of M.G. from several witnesses, and the prosecutor telling the jury M.G. was a "reliable witness" who had no incentive to lie, that Byrne was denied his constitutional right to a fair trial. Had this been a case where M.G.'s credibility was not the core issue for the jury to decide, the error may have been more tolerable. However, from the opening statement to the conclusion of the trial, this case was about M.G.'s credibility and believability. It was crucial that rules developed to ensure that the jury makes the conclusion of the credibility of witnesses be followed. We regret that they were not followed here, and Byrne's conviction must be reversed.

25

¶36 The testimony elicited from four witnesses vouching for M.G.'s credibility and the prosecutor personally commenting that M.G. was a reliable witness who had no incentive to lie undermined Byrne's right to a fair trial. His conviction is reversed.

/S/ LAURIE McKINNON

We Concur:

/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ JAMES JEREMIAH SHEA

Justice Beth Baker, dissenting.

¶37 Applying plain-error review—the standard Byrne acknowledges governs his unpreserved claims—and consistent with our precedent, I would hold on this record that Byrne received a fair trial and affirm his conviction. I dissent from the Court's decision to order a new trial.

¶38 Although the Court does not mention it, Byrne does not argue on appeal that his motion in limine preserved his claims about prosecutorial misconduct and improper vouching for M.G.'s credibility. Because Byrne did not make that argument, the State has had no opportunity to respond to any such proposition. The Court nonetheless concludes on its own that Byrne's motion preserved the issue. Opinion, ¶ 21. I disagree. As Byrne and the State both argue, I would analyze his claims under the plain-error standard of review.

26

¶39 When Byrne argued his motion in limine before the trial court, defense counsel, relying on *Scheffelman*, said,

> Really I'm trying to keep out the expert getting on the stand and saying this child is a credible witness. That is it. And so, my understanding is the stipulation by Mr. Moody is that he will not be eliciting from the expert, you know, do you believe the child, essentially would be the question.

The prosecutor explained what he expected to introduce through his experts and said, "I don't believe there's going to be any request uh, by the State to ask whether . . . the . . . alleged victim, is believable or not." He clarified that he would be asking about demeanor and what the witness observed, "not asking . . . whether you believed her." The court remarked, "Alright, but in any event the State understands the . . . Defense's concerns and is in agreement?" The prosecutor replied, "yes," and moved on to the next issue.

¶40 A motion in limine that is "sufficiently specific as to the basis for the objection[,]" *Crider*, ¶ 20, will be sufficient to preserve the issue if "the district court provided a definitive ruling" on the question, *Favel*, ¶ 19; Opinion, ¶ 20. We pointed out in *Favel* that "we have never allowed a party to preserve an issue based on a motion in limine without the party having obtained a definitive ruling from the district court on the issue." *Favel*, ¶ 19 (citing *Vukasin*, 2003 MT 230). We noted other authority to the same effect, observing that a party must object at trial unless the court has made a "*definitive ruling* on the record admitting or excluding evidence[.]" *Favel*, ¶ 20 (quoting Fed. R. Evid. 103(a) and adding emphasis). As we explained,

> Motions in limine are frequently made in anticipation of hypothetical circumstances that may not develop at trial and often times on a record that

27

is incomplete or only partially developed. . . . Consequently, a trial court will often be in a better position to rule on evidentiary issues in light of specific facts and circumstances that arise during trial.

*Favel*, ¶ 21 (internal citations omitted).  *See also Evans v. Scanson*, 2017 MT 157, ¶ 23, 388 Mont. 69, 396 P.3d 1284 (citing *Favel*, ¶ 19) ("A party may not preserve an issue for appeal, *even if based on an opponent's violation of an order in limine*, without the party first obtaining a definitive ruling from the district court on the issue.") (emphasis added).

¶41     Here, the parties and the court briefly discussed Byrne's motion in limine at the motions hearing.     They focused on the type of questions we addressed in *Scheffelman*, where we found error in the social worker's testimony "[giving] her opinion that the victim's statements [about the alleged offense] were truthful and that she was a victim of sexual abuse[.]"     *Scheffelman*, 250 Mont. at 341, 820 P.2d at 1298. The *Scheffelman* exception is implicated "only when the expert directly comments on the victim's credibility."  *State v. Robins*, 2013 MT 71, ¶ 12, 369 Mont. 291, 297 P.3d 1213. "Expert testimony that only indirectly bears on a child sexual abuse victim's credibility does not have to satisfy the [*Scheffelman*] exception's requirements to be admissible."  *State v. Reams*, 2020 MT 326, ¶ 11, 402 Mont. 366, 477 P.3d 1118 (quoting *Robins*, ¶ 12).  *See also State v. Morgan*, 1998 MT 268, ¶¶ 26, 31, 291 Mont. 347, 968 P.2d 1120 (upholding admission of witness's testimony regarding "patterns of child sexual abuse and factors to consider in the evaluation of a child's report of sexual abuse"); *State v. Scott*, 257 Mont. 454, 464-66, 850 P.2d 286, 292-93 (1993) (upholding admission of testimony from child's therapist "that it is not unusual for victims of sexual abuse to hear

28

voices or see things that are not reality" and to offer her opinion that "these symptoms were related to Scott, and not to those upon whom the defense was attempting to lay blame").

¶42 The record demonstrates that the District Court made no definitive ruling on Byrne's motion in limine because it presumed the parties were of one mind about what questions the prosecutor should not and would not ask. The court had no need to rule on the admission or exclusion of particular evidence, as the specific basis for Byrne's motion appeared to be uncontested. The trial court's general ruling at the final pretrial conference granting "all the motions that were made that were agreed to" did not alter the parties' pretrial posture. At trial, much of the testimony from the professionals who had worked with M.G. was the type of indirect comment on child victims' responses to sexual abuse of the sort we have allowed and accordingly drew no objection. Byrne made no argument that the State was violating the parties' agreement. Based on the parties' prior representations, and without a contemporaneous objection, the District Court was left to believe that Byrne found the State's questioning acceptable. If Byrne believed the prosecutor was exceeding the bounds of the agreement, he needed to speak up. But he didn't. Byrne made one objection (which I discuss in ¶¶ 54-55), at which time defense counsel did not mention the parties' agreement or any ruling in limine. The trial court had no opportunity to consider or rule on what Byrne now claims were repeated violations. Having obtained no definitive ruling on the specific testimony to which he objected, Byrne was obligated to object at trial to questions he believed exceeded the parties' agreement.

¶43 *Partin* is unhelpful to this analysis because it had nothing to do with preservation of the objection for appeal. Partin obtained a definitive pre-trial ruling prohibiting any

29

evidence regarding the defendant's prior crimes. On appeal, it was "undisputed" that a prosecution witness's reference to Partin's prior arrest violated the order in limine. *Partin*, 287 Mont. at 18, 951 P.2d at 1005. Unlike Byrne, however, Partin called the trial court's attention to it immediately and moved for mistrial; the only issue on appeal was whether the court abused its discretion in denying that motion and whether Partin suffered prejudice from the erroneous admission. *Partin*, 287 Mont. at 15, 22, 951 P.2d at 1003-04, 1008. Byrne did not alert the trial court to his concerns. Instead, just like Favel, he "failed to do 'what []he could to raise the issue in the district court.'" *Favel*, ¶ 22 (quoting *Vukasin*, ¶ 30).

¶44 Byrne accordingly sets forth the correct standard for our review in his appellate briefs. The Court discretionarily reviews an unpreserved claim for plain error when failing to review the error may result in a manifest miscarriage of justice, leave unsettled the fundamental fairness of the proceedings, or compromise the integrity of the judicial process. *State v. Smith*, 2021 MT 148, ¶ 15, 404 Mont. 245, 488 P.3d 531 (citations omitted). "We review prosecutorial misconduct claims to determine whether the alleged misconduct deprived the defendant of a fair and impartial trial." *Smith*, ¶ 15 (citation omitted).

¶45 The standard that applies to our review of a preserved challenge to the erroneous admission or exclusion of evidence is quite different. As trial error, an improper evidentiary ruling "is not presumptively prejudicial and therefore not automatically reversible, and is subject to review under our harmless error statute, § 46-20-701(1), MCA." *State v. Van Kirk*, 2001 MT 184, ¶ 40, 306 Mont. 215, 32 P.3d 735.

30

Once the error is shown, "it becomes incumbent on the State to demonstrate the error at issue was not prejudicial to the defendant." *State v. Lake*, 2019 MT 172, ¶ 40, 396 Mont. 390, 445 P.3d 1211 (citing *Van Kirk*, ¶ 42). "[T]o prove that a trial error was harmless, 'the State must demonstrate that there is no reasonable possibility that the inadmissible evidence might have contributed to the [defendant's] conviction.'" *Lake*, ¶ 40 (quoting *Van Kirk*, ¶ 47).[1]  For an evidentiary error to be harmless, the record must show that the jury was presented with admissible evidence proving the same facts as the tainted evidence.  *Smith*, ¶ 34 (citations omitted).  And the State bears the burden on appeal of demonstrating harmless error by showing "that there is no reasonable possibility that the inadmissible evidence might have contributed to the conviction."  *Van Kirk*, ¶ 47.  In contrast:

> The party requesting reversal because of plain error bears the burden of firmly convincing this Court that the claimed error implicates a fundamental right and that such review is necessary to prevent a manifest miscarriage of justice or that failure to review the claim may leave unsettled the question of fundamental fairness of the proceedings or may compromise the integrity of the judicial process.

*State v. George*, 2020 MT 56, ¶ 5, 399 Mont. 173, 459 P.3d 854.  Bearing in mind that Byrne carries the burden here, I turn to the trial record.

Witness Testimony

---

[1] Whether a party does or does not object to an evidentiary ruling, the Court may review the admission or exclusion of evidence affecting the party's "substantial rights[.]"  M. R. Evid. 103(a), (d).

¶46 Of the four witnesses whose testimony the Court finds faulty, three worked directly with M.G. and one—Dr. Wendy Dutton—did not. As she was the State's first witness, I address her testimony first.

¶47 The Court concludes that, even though Dr. Dutton was a "blind expert" who never met M.G., did not participate in the investigation, and never reviewed any of the reports or other materials related to the case, she improperly bolstered M.G.'s credibility when she testified that false reports are "rare" because that implied that M.G. was telling the truth. Opinion, ¶ 27. Dr. Dutton in fact said nothing about M.G., and Byrne offered no objection throughout her testimony.

¶48 We have reviewed claims involving similar testimony from Dr. Dutton on several occasions. In one such case,

> Dutton testified about the process of victimization, how victims disclose abuse, children's typical reactions to abuse, the most common situations when children make false allegations, and the proper protocol for conducting a forensic interview with a child. Dutton did not discuss the specifics of [the defendant's] case and did not offer an opinion of whether [the child] had been abused.

*Robins*, ¶ 7. We upheld the admission of this testimony without applying "the exception that allows direct comment on credibility because she did not comment directly on the victim's credibility." *Robins*, ¶ 14. "She did not offer an opinion of whether the victim was credible." *Robins*, ¶ 14. Instead, "Dutton limited her testimony and only testified about general child sexual abuse patterns." *Robins*, ¶ 14. It bears repeating that among such "general" patterns was Dr. Dutton's testimony about "the most common situations when children make false allegations." *Robins*, ¶ 7. We concluded that "Dr. Dutton's

32

testimony did not impinge upon the jury's obligation to ultimately decide [the child's] credibility; it merely allowed the jurors to make an informed decision." *Robins*, ¶ 17. *See also State v. Given*, 2015 MT 273, ¶ 46 n.2, 381 Mont. 115, 359 P.3d 90 (addressing Dr. Dutton's similar testimony and noting that "[w]e have long recognized such testimony as admissible under M. R. Evid. 702").

¶49    Just weeks ago, we refused to reverse a child sex abuse conviction for plain error in a case markedly like Byrne's. *Sinz*, 2021 MT 163. Dr. Dutton's testimony in Byrne's trial was substantively identical. She did not vouch for M.G. or otherwise comment directly on her credibility. Instead, she

> explained that false allegations generally, but not exclusively, occur in two types of scenarios. The "more common" false allegation is an erroneous report where, upon investigation, there is a normal and innocuous explanation for the child's statements (e.g., touching during bath time). The other is a "malicious false report, which tends to be more rare." This type of report is usually connected to an ulterior motive or attempt to secure secondary gain. Dr. Dutton explained that when incidents of false malicious reports occur:
>> [T]hey tend to occur most commonly, but not exclusively, in two situations. The first is generally involving young children whose parents are involved in a high conflict divorce or custody dispute. . . . The [second situation] is typically the teenage girls. And usually the goal or ulterior motive is trying to cover up the fact that they are having consensual sex with somebody.

*Sinz*, ¶ 10 (quoting trial testimony). What's more, the closing arguments were quite similar to those the prosecutor gave in this case:

> when referring to Dr. Dutton's testimony, the prosecutor stated that "Dr. Dutton wasn't here to comment on the girls' credibility, but what she told you is that incidents of malicious false allegations of child sex abuse are very rare. And I would submit to you this is not one of those cases."

33

*Sinz*, ¶ 12. We expressly rejected Sinz's argument that Dr. Dutton's testimony "amounted to a 'recitation of statistical data,' which undermined the presumption of innocence and implicated a fundamental right." *Sinz*, ¶ 29. We concluded:

> Dr. Dutton did not provide statistical testimony nor undermine his presumption of innocence. Dr. Dutton's testimony was educational in nature, as she explained the process of victimization, testified to general causes of false reports in child sexual abuse cases, and discussed general issues underlying sexual abuse disclosures. Dr. Dutton did not comment on the facts of the case or provide an opinion about whether K.B. and D.B. had been abused. The suggestion that Sinz's case may share some similarities with Dr. Dutton's research does not render her testimony improper or inadmissible.

*Sinz*, ¶ 31. The Court's effort to distinguish *Sinz* parses Dr. Dutton's testimony too finely. Despite the minor differences at Byrne's trial, her testimony was consistent with what we frequently have characterized as *indirect*—hence permissible—comment on a child's credibility. As there is no meaningful distinction here, I would reach the same conclusion.

¶50 The State's next professional witness was Susan Keller, M.G.'s therapist. Ms. Keller discussed her work with M.G., M.G's response to anxiety and stresses from the process involved in the case and from "what she report[s] happened" to her, and M.G.'s concern that there was something different or wrong with her that she had been assaulted. Ms. Keller did not talk to M.G. about the details of the alleged assault and gave no testimony commenting directly or indirectly on M.G.'s credibility.

¶51 The State next called "Freddie" Grunhuvd, who worked as a school-referred therapist with both M.G. and her brother when they lived in Deer Lodge. Ms. Grunhuvd started seeing M.G. when the child was in kindergarten to help treat her Oppositional Defiance Disorder. She worked with M.G. until 2011, when M.G. moved to Drummond,

34

and had stopped seeing her well before M.G. made any disclosures about Byrne's alleged assaults. Ms. Grunhuvd testified about M.G.'s Oppositional Defiance Disorder as a young child and how it manifested. She described M.G. as "angry and hostile" and prone to temper tantrums, particularly with her mother, her teacher, and occasionally the school principal. In that context, the prosecutor asked, "Does oppositional defiance disorder . . . carry with it um—let me rephrase that one. Did [M.G.] present signs of extreme dishonesty?" When the witness answered without objection, "No," the prosecutor asked, "How about manipulation?" Again without objection, the answer was "no." Ms. Grunhuvd was clear that M.G. never made any disclosures about inappropriate touching during the time they worked together, and she gave no testimony related to the allegations in this case except that when M.G.'s mother called her for advice, Ms. Grunhuvd referred her to the Drummond therapist with whom M.G. then was treating.

¶52    On cross-examination, defense counsel reiterated that M.G. was referred to Ms. Grunhuvd by the school for her "angry outbursts" and related behaviors, and followed up with "whether [extreme] untruthfulness *was part of the referrals*[.]"  (Emphasis added.) Counsel clarified that any untruthfulness was "more . . . typical for her age" and "minimal." Remember, Ms. Grunhuvd stopped seeing M.G. in May 2011, long before she made any disclosures about Byrne.

¶53    M.G. was thirteen years old when she went to see Jane Hammett for the forensic interview. On direct examination, the prosecutor had Ms. Hammett explain her forensic interview techniques and what she does in the process to educate the child and assess the child's ability to tell the truth, as well as "sensory questions" she asks to help "activate"

the child's memory. In that context, the prosecutor asked if Ms. Hammett saw "signs of dishonesty or that she had been coached." Byrne offered no objection. Ms. Hammett gave no testimony about the allegations M.G. made during the interview and offered no opinion about whether those allegations were credible.

¶54 The State's final professional witness was Gina Dalrymple, the Drummond counselor who worked with M.G. from September 2011, when she transferred to school there, through November 2013. During that time, Ms. Dalrymple changed M.G.'s diagnosis from Oppositional Defiance Disorder to Depressive Disorder. She described M.G. as presenting with "a typical trauma reaction." On direct examination, Ms. Dalrymple testified that M.G. acknowledged there "had been a trauma in her life" but never gave her any details about it and "[n]ever discussed it." In fact, "she's had zero words about discussing it[.]" Not until responding on cross-examination did Ms. Dalrymple confirm that M.G. had said the trauma was sexual abuse. Defense counsel had Ms. Dalrymple acknowledge that she had brought up the topic after conferring with Ms. Grunhuvd and with M.G.'s mother. On redirect, the prosecutor followed up, asking if Ms. Dalrymple had asked M.G. "point blank, did this happen[?]" Ms. Dalrymple said no, that she had told M.G. that Ms. Grunhuvd had called and "talked about some stuff that was in the past" and asked M.G., "do you want to discuss it?" Ms. Dalrymple asked M.G. additional questions about whether she felt safe and what she was feeling "at that moment." The prosecutor then asked if Ms. Dalrymple saw "any signs of manipulation out of [M.G.] when she was talking about this?" There was no objection, and the witness answered no. The prosecutor followed up with whether Ms. Dalrymple saw "any signs of, that uh, she

36

was being dishonest with you?" Byrne's counsel objected without stating the grounds for objection, and the court overruled it.

¶55 From this discussion of the testimony, it is clear that defense counsel objected only when the prosecutor asked for a direct response from one witness about M.G.'s honesty when discussing her accusations against Byrne. That objection was consistent with the parties' stipulation and was appropriate. But counsel did not elaborate with "the specific ground of objection," M. R. Evid. 103(a)(1), and did not argue that the State was violating the parties' agreement on Byrne's motion in limine. Nonetheless, I agree for purposes of this discussion that the trial court should have sustained that objection.

¶56 Given the pretrial discussion of Byrne's motion in limine, however, and applying our case law, I would conclude that all but one of the prosecutor's other questions did not invite error. For example, Byrne offers no authority that asking a trained therapist whether the witness saw an indication that the child had been "coached" or "manipulated" is inappropriate. Such a question does not necessarily direct comment on the credibility of the child's allegations against the defendant. On the contrary, how to determine whether a child has been coached to give specific statements is appropriate in the discussion of general issues underlying the evaluation of children's sexual abuse disclosures. An objection would be appropriate, however, to questions about "dishonesty" and "untruthfulness" in the context of the allegations at issue in the case, as those questions would call for a "direct[] comment[] on the victim's credibility." *Reams*, ¶ 11 (quoting *Robins*, ¶ 12). Here though, the prosecutor's questions to Ms. Grunhuvd were in the context of her work with M.G.'s Oppositional Defiance Disorder years earlier; she had

nothing to do with M.G.'s disclosures about Byrne. His question to Ms. Hammett—a compound question combining signs of coaching or dishonesty—was a question about M.G.'s interview in general and would have been entirely proper had he omitted the phrase "of dishonesty" from his question.

Closing Argument

¶57 "We review alleged improper statements during a closing argument in the context of the entire argument; we do not presume prejudice from the alleged misconduct, and the burden is on the defendant to show the argument violated his substantial rights." *Smith*, ¶ 42. Again, Byrne acknowledges that he did not object to the prosecutor's closing argument and that the plain-error standard of review applies.

¶58 As we reaffirmed recently in *Smith*, ¶ 47, "[a] prosecutor properly may comment both on the credibility of witnesses and on inferences the jury should draw from the evidence." (Citing *McDonald*, ¶ 14.) "A prosecutor's argument is not plain error if made in the context of discussing the evidence presented and how it should be used to evaluate a witness's testimony under the principles set forth in the jury instructions." *Smith*, ¶ 51 (quoting *State v. Ritesman*, 2018 MT 55, ¶ 28, 390 Mont. 399, 414 P.3d 261). Here, review of the closing argument in its entirety reveals that, unlike instances in which we have concluded that a prosecutor improperly commented on the truthfulness of a witness, *see Hayden*, ¶¶ 12-14, 32-33, the prosecutor did not offer her personal opinion on the credibility of witnesses but drew inferences from the evidence.

¶59 The prosecutor's comment about M.G. being a "reliable witness" was made completely in the context of discussing the evidence and was not improper. He began by

38

pointing to M.G.'s testimony that—as "a girl who's aiming for straight A's [sic]"—"[t]he worst thing that she can possibly imagine is failing a test and she'd rather go do that [than] be here in front of you." The prosecutor drew the jury's attention to the court's instruction on direct and circumstantial evidence. He discussed the difference, noting M.G.'s testimony as direct evidence and "what [M.G.] was showing after these events occurred" as circumstantial evidence. He turned to the instruction on believability of witnesses, emphasizing the jury's role as the sole judge of credibility. He then asked,

> How do we know when witnesses are reliable? You're allowed to look at their demeanor. You're allowed to look at their statements in relation otherwise. You're able to look at their lack of motive to lie. You're able to look whether their statements are verifiable.

The prosecutor proceeded to review with the jury M.G.'s testimony to help it evaluate her credibility, asking it to "look at her body language," to ask what "she ha[d] to gain by this," to recall whether her statements were consistent and how she was candid when she didn't always remember every detail. He asked the jury to recall the details that she did remember.

> It wasn't just the gory details that she testified to, but it was the minute ones. She remembers how odd it was that she was going to the store with both families. She remembers what she was wearing on one of the occasions. Not all three, just one of them. Does this look like a girl who's making things up?

¶60 He then asked the jury to evaluate M.G.'s testimony in light of what it had learned from the professionals, including "the process of victimization," "victim selection," "engagement," "grooming," "the assault," and then "concealment." He then discussed the evidence on each of those factors and why it took time for M.G. to make her disclosures.

39

He reminded the jury "that just one fact is not enough to go convict Mr. Byrne" but that it had to consider "the totality of circumstances" from all the testimony. He emphasized that Ms. Hammett and Dr. Dutton both talked about the importance of not asking leading questions and reminded the jury of the evidence that M.G. was not a girl who could be forced "to say anything that she didn't want to." He went through the evidence that M.G. had started to "throw[] fits" about spending time with the Byrne family when no one knew why, despite her close relationship with the Byrne children and with Byrne's wife. And he asked the jury to recall what prompted M.G. to come forward and why "she was ready for it."

¶61    He finally discussed the suggestion that perhaps M.G. "got the wrong person"—harkening defense counsel's questions about M.G. not wanting to see her father again after spending the summer of 2011 with him and about M.G. being upset when she returned to find her mother had moved the family to Drummond—or, the prosecutor asked rhetorically, "that it didn't happen at all?" He reminded the jury about M.G.'s "100 percent" certainty that it was Byrne; that even though she did not recognize him in the courtroom, she knew "it was Rachel's husband" and the assault happened "[a]t Rachel's house." It was Byrne who had been grooming her, giving her more affection than the other children, and so forth. He asked the jury to remember Dr. Dutton's testimony that it "is incredibly rare for a person to mistake the identity of the person" and then discussed why M.G.'s circumstances did not fit those when a child would lie about the abuse to "get something out of this." It reminded the jury that it needed to "use your common sense when evaluating whether somehow [M.G.] was coached or taught to lie." It asked the

40

jurors to "look at her testimony" and the things she did and did not remember when questioned. He concluded:

> If a person had been coached to lie, if she thought it was so important to get every single fact out there that would convict Mr. Byrne[,] she would've said, I remember this was on uh, November 25th of 2009. I remember that I was wearing this. I remember that he was wearing this. This is where everybody was in the house. No, her answers were, I don't remember that. She struggled. She's a reliable witness. She's doing her best to tell you what she remembers.

This plainly is not a statement of the prosecutor's personal opinion vouching for M.G.'s reliability. The prosecutor properly discussed the evidence presented and how the jury should use it to evaluate M.G.'s testimony under the principles set forth in the jury instructions. *See Smith*, ¶ 51; *Ritesman*, ¶ 28.

Conclusion

¶62 Without plain error in the prosecutor's argument or in the admission of Dr. Dutton's testimony, what it comes down to is whether the overruled objection to one question to Ms. Dalrymple and the uncontested question to Ms. Hammett on signs of M.G.'s "dishonesty," when examined in light of the record as a whole, leave unsettled the fundamental fairness of Byrne's trial. Upon review of the entire record, I am convinced they do not. The Court takes out of context the State's isolated closing references to the weaknesses in M.G.'s testimony. Opinion, ¶ 32. The State pointed to the "minor inconsistencies" that defense counsel had explored in detail—like M.G.'s inability to remember if one of the assaults occurred on Thanksgiving—and pointed out that her inability to recall exact dates was "not abnormal" and the jury should "remember what she did remember and how she recalled the information from sensory detailed questions." M.G.'s ability to acknowledge when she

41

was only "65 percent sure [or] 80 percent sure" of certain details, while being "100 percent sure it was Mr. Byrne . . . is consistent with what we learned about memory. The important stuff stick[s] in our mind."

¶63 M.G. offered compelling testimony about the allegations against her, recalling the separate incidents by the color of her mother's curtains being "a new shade of red," or by seeing her brothers on the stairs as Byrne carried her up them, or by the smell of her mom's room, "like home." She reluctantly walked through the details of each of the three assaults, what it felt like, and how she and Byrne acted afterward, acknowledging candidly that she couldn't recall "what orders they happened in." She was afraid to tell other people about Byrne's actions because she thought they "would think less of [her.]" The professional witnesses offered admissible testimony about [M.G.]'s demeanor before and after the alleged abuse. Even when she suffered from Oppositional Defiance Disorder, M.G. was "a very likeable kid[,] very polite[, and] always engaged in anything we asked her to." But after the time of the alleged assaults, "she had a typical trauma reaction." She had flat affect, low self-confidence, and was "real withdrawn." During her work with Ms. Dalrymple on an expressive arts activity, M.G. cut out a magazine picture of a pistol and placed it "right on the belly" of the body outline she had drawn on white paper—a classic indicator of trauma. Ms. Hammett described M.G. as someone whose "body language was very closed," did not maintain eye contact, and "hung her head down."

¶64 The fact witnesses—Dee Allen, with whom M.G. lived for a time after the family moved and to whom she initially disclosed the assault; M.G.'s mother Lisa; and other friends and relatives who had been at the home—all provided testimony corroborating the

42

circumstances under which M.G. alleged the assaults occurred. And finally, the jury heard evidence of Byrne's statements to Sheriff Scott Howard, insisting that he had never even been with M.G. alone, despite several witnesses' testimony to the contrary.

¶65 Putting all the challenged testimony and argument in the context of the whole record, Byrne has not sustained his burden to show that the alleged evidentiary errors compromised the integrity of the judicial process. Byrne received a fundamentally fair trial, and his conviction should stand.

/S/ BETH BAKER

Chief Justice Mike McGrath and Justice Jim Rice join in the Dissent of Justice Baker.

/S/ MIKE McGRATH
/S/ JIM RICE